# DANIEL C. SCHWALB, Appellant, v. RUTH HOGUE SCHWALB, Appellee.—282 S. W. (2d) 661.

Western Section. January 13, 1955.

Petition for Certiorari denied by Supreme Court, June 10, 1955.

Harold Johnson and Hancock & Manhein, all of Jackson, for appellant.

Robert A. Tillman, of Memphis, and Brooks McLemore, of Jackson, for appellee.

BEJACH, J. This case involves a contested divorce suit with a cross bill for separate maintenance, appealed from the Chancery Court of Madison County, Tennessee. As the appellant was the complainant or petitioner in the lower court, the parties will, for convenience, be styled as complainant and defendant, or by their names, Mr. Schwalb and Mrs. Schwalb. There was a cross bill by Mrs. Schwalb seeking a decree for separate maintenance. The Chancellor, exercising his inherent authority, sustained the cross bill and allowed separate maintenance

to Mrs. Schwalb, as cross complainant, but not on the grounds alleged.

The cause also involved the question of custody of two children of the complainant and defendant, Diane Schwalb and Judy Kaye Schwalb, aged respectively, 16 and 14. There was also involved a question of contempt alleged to have been committed by the defendant and cross complainant, Mrs. Schwalb, consisting of violation of the terms of an injunction granted by the Chancellor on the original bill or complaint of Mr. Schwalb. At the trial of the cause, the complainant, leave of court having been first obtained, amended his original bill by adding two additional grounds of divorce, viz., habitual drunkenness of the defendant contracted after the marriage of the parties; and that the defendant had attempted the complainant's life by means showing malice. The original bill had been filed on the ground of cruel and inhuman treatment. By agreement, the trial for contempt of court against the defendant, Mrs. Schwalb, was tried simultaneously with the trial of the cause on its merits.

Mr. and Mrs. Schwalb were married in June, 1936. They lived in Memphis until 1939. At that time they moved to Jackson, Tennessee where they lived together as husband and wife until the separation which occurred June 6, 1953. Since their separation, they have continuously lived apart, although there is some evidence in the record that on two or perhaps three occasions after the separation, but before the filing of the bill for divorce, the parties were together and had sexual relations with each other. Mr. Schwalb did not, however, return to the home of Mrs. Schwalb to live. Mr. Schwalb owns and operates the Double Cola Bottling plant in Jackson.

The marriage does not appear to have been a happy one, even from the beginning. Soon after the parties

married, trouble developed between Mrs. Schwalb and her husband's mother and she left complainant on two occasions for a week or so at a time. Complainant says that throughout their marriage they had more arguments than married couples ordinarily have; that his wife was continually dissatisfied about something and that she nagged and argued constantly. The record discloses, and the Chancellor found as a fact, that the defendant was in the habit of using profane and obscene language, and that a large part of same was directed towards complainant. The record discloses that Mrs. Schwalb has, on several occasions, consulted a psychiatrist. No contention is made that she is mentally incompetent, and she, herself, testified that one psychiatrist told her that her mind was perfectly all right.

At the trial of the cause, the Chancellor dismissed the original bill, and found as a fact that neither complainant nor defendant had been guilty of cruel and inhuman treatment. Under his inherent authority, however, the Chancellor did sustain complainant's cross bill for separate maintenance, decreed separate maintenance in her behalf in the amount of $75 per week, and granted custody of the children to her. Complainant, as cross defendant, was also required to provide Mrs. Schwalb with an automobile and to keep up payments on the home place in Jackson, Tennessee on Burkett Street, the exclusive use of which was decreed to her and the children. The complainant was granted the exclusive use, management and control of the residence of the parties in which they had formerly lived in the Bon Air Subdivision in Madison County, Tennessee. Both the home place in Jackson and the one in the Bon Air Subdivision were held by the parties as tenants by the entireties. The injunction against Mrs. Schwalb was continued in full force and

effect. Mr. Schwalb was required to pay $500 solicitors' fees for cross complainant's solicitors, and the costs of the cause were taxed against him. The contempt citation was dismissed.

 We need not consider further the contempt question, because, in Tennessee, there is no right to appeal a judgment of acquittal in a contempt case. Gunter v. Seaboard Copper Mining Co., 142 Tenn. 14, 215 S. W. 273; Collier v. City of Memphis, 160 Tenn. 500, 26 S. W. (2d) 152.

After the dismissal of his bill, complainant, through his solicitors, requested the Chancellor to make 22 additional findings of fact. The Chancellor did find as requested, paragraphs 1, 3, 4, 8, 10, 11 and 12 of the requested additional findings of fact, which are as follows:

"1. Complainant and defendant were married in Memphis, Tennessee, on June 21, 1936. After their marriage they lived together as husband and wife in Memphis until September, 1939, when they moved to Jackson, Madison County, Tennessee, where they continued to live together as husband and wife until June 6, 1953. Since June 6, 1953, complainant and defendant have lived apart continuously and now are living apart. Two children, namely, Jamie Dian Schwalb, 16 years of age, and Judy Kaye Schwalb, 14 years of age, were born unto their marriage. These children are now living with defendant and have lived with her since June 6, 1953.

"3. In February, 1952, after the parties had a fight, defendant kept a butcher knife on the table next to her bed for a period of eight days, which she says she would have used on complainant if necessary to defend herself. (pp. 361, 470, 471, 472, 473)

"4. In January or February of 1953, several months

before the separation of the parties, complainant found a butcher knife in defendant's bedroom under a pillow on her bed. The parties were having serious domestic difficulties at this time. (pp. 16, 17, 109, 110) On other occasions, complainant found butcher knives at somewhat unusual places about the house. (pp. 17, 18, 110) Defendant's explanation of this is that the knives were used by her to make certain minor household repairs. (p. 366)

"8. After leaving home, complainant obtained a room at Midtown Motel in Jackson, Tennessee, where he stayed for several weeks. He then converted an office at his place of business, the Double Cola Bottling Company, into a bedroom and has been sleeping at his plant since leaving the tourist court.

"10. About a month after the separation of the parties, that is, on or about July 13, 1953, defendant went to complainant's room at the Midtown Motel at about 1:45 o'clock in the afternoon. Complainant admitted defendant into the room and they talked for about an hour; whereupon, a violent argument developed. Defendant then went outside the room and obtained a 32 caliber revolver from her vehicle which was parked just outside. She returned to complainant's room with the weapon in her purse, then pulled the gun from her purse, and held it on complainant for 45 minutes or longer, all the while threatening and cursing complainant. On several occasions, defendant pulled the hammer of the gun back as if to fire, but her anger finally subsided, and she left the premises. (pp. 28, 29, 30, 31, 32, 33, 34, 119, 120, 121, 122, 123, 267, 372, 373, 374, 377, 486, 487, 488, 489, 493, 494)

"11. On another occasion, after the tourist court

incident and on or about July 18, 1953, defendant went to complainant's office at the bottling plant and threatened to strike complainant, as well as one of his employees, with soft drink bottles. Complainant was able to take the bottles away from her before she struck anyone. In this occasion, there was a violent argument and much cursing on the part of defendant. (pp. 34, 35, 36, 37, 132, 133, 205, 206, 207, 208, 209, 378, 379, 380, 381, 503, 504, 505, 506, 507)

"12. In December, 1953, defendant went to complainant's office during his absence and carried away a diary which he was keeping of his troubles with her. The next day she returned, pilfered his desk, and carried away certain letters addressed to complainant. (pp. 37, 38, 39, 40, 381, 382, 383, 510, 511, 512)"

About a year and four months before the separation on June 6, 1953, namely, in February, 1952, Mr. Schwalb did beat Mrs. Schwalb and she was injured sufficiently for him to call a doctor to attend her. This is the only instance of mistreatment of Mrs. Schwalb by Mr. Schwalb which is proved in the record of this case, and she continued to live with him for many months, thereafter. Indeed, she tried to get him to return after the separation and even testified that she wished him back at the time of the trial.

Mr. Schwalb has appealed from the Chancellor's decree and has made five assignments of error in this Court, which assignments of error are as follows:

"1. The Chancellor erred in finding that defendant had not been guilty of such cruel and inhuman treatment or conduct toward complainant as rendered it unsafe and improper for complainant to cohabit with and be under her dominion and control.

"This was error because the preponderance of the evidence showed that defendant had been guilty of such cruel and inhuman treatment or conduct. As a consequence of this error, complainant's bill was dismissed.

"2. The Chancellor erred in finding that defendant had not attempted complainant's life by means showing malice.

"This was error because the preponderance of the evidence showed that defendant had attempted complainant's life by means showing malice. (Tr. 90, 91, 92, 440, 441, 552, 553) As a consequence of this error, complainant's bill, as amended, was dismissed.

"3. The Chancellor erred in finding that defendant was not guilty of habitual drunkenness contracted after the marriage of the parties.

"This was error because the preponderance of the evidence showed that defendant had contracted the habit of drunkenness after her marriage to complainant. (Tr. 79, 80, 176, 329, 330, 336, 337, 369, 370, 371, 378, 380, 381, 383, 384, 387, 422, 423, 425, 671, 672) As a consequence of this error, complainant's bill, as amended, was dismissed.

"4. The Chancellor erred in granting separate maintenance, or any other relief, to defendant.

"This was error, first, because the preponderance of the evidence showed defendant guilty of extreme cruelty and inhuman treatment toward complainant, habitual drunkenness, an attempt upon complainant's life, and other misconduct; and, secondly, because it was not shown by a preponderance of the evidence that complainant had been guilty of any misconduct or wrongdoing of any kind. For these

reasons, defendant was not entitled to separate maintenance or other relief.

"5. The Chancellor erred in awarding the custody of the minor children of the parties to defendant.

"This was error because the preponderance of the evidence showed the defendant was not a suitable or proper party to have custody of the minor children, and that it was manifestly to the best interests of the children that complainant be awarded care and custody of them."

The first assignment of error asks this Court to find as a fact, although the Chancellor found to the contrary, that defendant was guilty of such cruel and inhuman treatment or conduct towards the complainant as rendered cohabitation unsafe and improper.

■ In that situation, the law in Tennessee as set out in Section 10,622 of the 1950 Supplement to the Code of Tennessee is as follows:

"All cases tried in a court of record without the intervention of a jury, whether in a court of equity or a court of law and whether tried according to the forms of chancery or according to the forms of law, jurisdiction to review which is in the court of appeals, shall be reviewed upon a simple appeal, as now provided in equity cases; and no motion for a new trial shall be necessary, but when the case is tried on oral evidence a bill of exceptions shall be filed and included in the transcript. In all such cases the hearing of any issue of fact or of law in the appellate court shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the judgment or decree of the trial court, unless the preponderance of the evidence is otherwise."

It becomes necessary, of course, for this Court in passing upon this assignment of error, as well as the other assignments of error, to examine the evidence in the record for the purpose of ascertaining where the preponderance lies.

From the evidence in the record, it appears that Mr. and Mrs. Schwalb were married in June, 1936. They lived in Memphis until 1939, at which time they moved to Jackson where they lived together as husband and wife until their separation, June 6, 1953. Since their separation, they have lived continuously apart. Mr. Schwalb is 38 years of age and Mrs. Schwalb is 36. They have two daughters, Diane, aged 16 years, and Judy Kaye, aged 14 years. Mr. Schwalb owns and operates the Double Cola Bottling plant in Jackson, Tennessee.

Apparently the parties to this marriage have had trouble almost from the beginning. Soon after the parties were married, trouble developed between Mrs. Schwalb and her husband's mother, and she left complainant on two occasions for a week or more at a time. Complainant says that throughout the marriage, they had more arguments than married couples ordinarily have; that his wife was continually dissatisfied about something, and that she nagged and argued constantly. Complainant's contention in this regard is abundantly sustained by the evidence in the record.

Mrs. Schwalb appears to be a profane, cruel and vindictive woman,—at times violent,—and determined to employ every means at her command to embarrass or humiliate her husband, and more especially, to carry her point in any argument. For a year or two, she was not on speaking terms with her own mother. She had physical encounters with her sisters. She engaged in such an encounter with complainant's mother.

Mrs. Schwalb has had three female operations since their marriage,—one in 1936, the second in 1940, and the last in 1948. Her nervous system was affected by these operations, and her doctor prescribed "nerve pills", probably barbiturates, and nerve tonics which she says she has been taking as prescribed.

In the summer of 1951, the marital difficulties of Mr. and Mrs. Schwalb became more critical. They were, at that time, living in the Bon Air Subdivision in Madison County, but outside the corporate limits of Jackson. Mrs. Schwalb did not like the country, did not like her house, and did not like her neighbors. After being subjected to three years of harassment about their Bon Air residence, complainant borrowed money and bought a house in Jackson. This is the Burkett Street residence in which Mrs. Schwalb is still residing and which was awarded to her by the Chancellor's decree. The title to this property, as well as that of the Bon Air Subdivision property, stands in the name of both Mr. and Mrs. Schwalb as tenants by the entireties.

There was much argument and dissension about the rearing of the children. Over the objection of his wife, Mr. Schwalb bought for the children, an air rifle and a pony, as well as some other things; and taught the older child to drive an automobile. One thing which Mrs. Schwalb would not tolerate under any circumstances, according to her own statement, was for her husband or anyone else to contradict her in the presence of the children. At times, however, according to complainant, her demands upon the children were "so overbearing and so ridiculous" that he felt it was necessary for him to intervene. In an effort to stop defendant's incessant arguing, complainant tried, as he says, "every possible remedy". His testimony on this point is as follows: "I

did everything I could possibly and humanly do. I did anything from pacifying her, bullying her, agreeing with her, and even keeping my mouth shut entirely, but none of them did any good." According to Mr. Schwalb's testimony, Mrs. Schwalb began to use an unusual amount of profanity and obscene language, and also began drinking an immoderate amount of whiskey, and began taking more barbiturates than she should have taken. From that time on, the marital affairs of the parties grew steadily worse. The Chancellor found as a fact "That the defendant did use obscene and profane language, and that a large part of same was directed toward the complainant." The Chancellor found against the charge of habitual drunkenness. His finding of fact on that is:

"The Court finds that the defendant drank some intoxicating liquors, but the proof fails to show that it was done to excess."

Complainant testified that in January or February, 1953, at a time when he and his wife were having serious trouble and were sleeping in separate bedrooms, he found a butcher knife concealed under his wife's pillow. They were, at that time, he said, living on Burkett Street in Jackson. Mrs. Schwalb denies this instance. She testifies that the only time she kept the butcher knife about her bed was in February, 1952 while they were living in the Bon Air Subdivision. According to her testimony, she kept "a great, big, long butcher knife" on a table next to her bed for a period of eight days after Mr. Schwalb's mistreatment of her in February, 1952. Her purpose, she states, was to defend herself if this proved necessary. On several other occasions, the complainant found butcher knives at somewhat unusual places in the house. The Chancellor's findings of fact were in favor of complainant on the issue of the butcher knives. Defend-

ant's version is that she had left the butcher knives at various places, incident to making minor household repairs. Complainant also testified that about this time, while they were seated in the kitchen, that Mrs. Schwalb jumped up, grabbed a butcher knife and held it under his throat, and threatened his life. She denied this incident as she did likewise an incident in which Mr. Schwalb claims she came into his bedroom when they were occupying separate rooms, with a pistol, and threatened his life. In view of the fact that their daughter, Diane Schwalb, who was present on the latter occasion, denies having seen any pistol, we cannot criticize the Chancellor's finding with reference to that occurrence. There are, however, suspicious circumstances in the testimony of Mrs. Schwalb and in that of their daughter, Diane, which tend to corroborate Mr. Schwalb's version rather than that of his wife and his daughter.

On June 6, 1953, complainant left the residence of the parties and has not returned to live there. Nothing particularly serious seems to have occurred on the occasion of complainant's departure There was an argument and some difficulty about a dinner engagement which the parties had, and Mr. Schwalb appears to have told his wife that she was ''obnoxious''. It was not what happened on June 6th that caused him to leave, Mr. Schwalb states; but, ''It was just an accumulation of everything that had taken place before. It was a sort of straw that broke the camel's back.''

After leaving home, complainant obtained a room at the Midtown Motel in Jackson, Tennessee, where he stayed for several weeks. He later converted an office at his place of business, the Double Cola Bottling Company, into a bedroom which he has been occupying ever since leaving the tourist court. Following Mr. Schwalb's de-

parture from home, but prior to the filing of the bill for divorce in this case, a number of incidents occurred which are set out in the bill, as amended, and which it is contended, would alone constitute grounds for divorce if previous grounds did not exist.

According to the contention of complainant, in July, 1953, defendant deliberately tried to crash an automobile which she was driving at a rapid rate of speed, into a vehicle driven by Mr. Schwalb, while approaching from the opposite direction. This incident will be discussed at some length in disposing of the second assignment of error, which is, that defendant had attempted complainant's life by means showing malice.

On July 13, 1953, a little more than a month after the separation, defendant went to complainant's room at the Midtown Motel, pulled a thirty-two caliber revolver on him, and held it on him, according to her own testimony, for forty-five minutes. Her purpose on this occasion, Mrs. Schwalb testified, was to get her say in and that for once she succeeded. According to her testimony, the revolver was loaded with blanks, but she admits that Mr. Schwalb did not know this, and that on several occasions she drew the hammer back as if to fire, after having threatened him. The gun in question is made an exhibit in this record, as are the bullets which were in it when Mrs. Schwalb delivered the gun to Mr. Leroy Pope, who in turn, turned it over to complainant's solicitors. The bullets in the gun at the time it was so delivered are live ammunition and not blanks. Mrs. Schwalb's own version of this incident, as appears from part of her testimony, is as follows:

"* * * But before I did that I was determined I was going to tell Mr. Schwalb one time in my life, I was going to tell him what I thought of him, and I

told him. I went to the door and knocked on the door and he said 'I'm not going to let you in,' I said, 'If you don't, I am going to scream to the top of my voice'. He let me in. We talked for about an hour and he was getting more insulting all of the time, he said 'I ought to knock your damn brains out when we were out there in the country', I said, 'Well, why didn't you just finish it', and he said, 'I Think I will'. I said, 'Would you like to see something the children have, in the car,' He said, 'Yes', I went out, so I got the gun and put it in my pocketbook and went back in there and sat down and told him to sit down, and I pulled the gun out and I talked to him.

"Q. 244. Did you point it at him? A. I sure did point it at him.

"Q. 245. How long did you talk to him, Mrs. Schwalb? A. I guess I talked to Dan for forty-five minutes with that gun on him.

"Q. 246. Was the gun loaded? A. Yes.

"Q. 247. Did it have bullets in it? A. Blank ones.

"Q. 248. Blank cartridges? A. Yes.

\* \* \* \* \* \*

"Q. 273. Mrs. Schwalb, did you at any time mean to kill Mr. Schwalb while you were there? A. No, I did not want to kill Mr. Schwalb.

"Q. 274. Did you threaten to kill him? A. Yes.

"Q. 275. Did Mr. Schwalb act like he was afraid of you? A. Do you mean at the tourist court?

"Q 276. Yes, in the tourist court. A. Yes, he was sitting there agreeing with me.

"Q. 277. He did listen to what you had to say? A. He sure did.

"Q. 278. How long before that did Mr. Schwalb listen to what you had to say, Mrs. Schwalb? A. He had never listened to what I had to say, but he listened that time.

"Q. 279. All right. A. He even agreed."

\* \* \* \* \* \*

On cross examination, on this subject, she testified:

"Q. 235. Now, you went down there to the Midtown Tourist Court with a gun, didn't you? A. I did.

"Q. 236. You said it had blanks in it, didn't you? A. It did.

"Q. 237. Why did you put blanks in that gun? A. Because I did not want to kill Mr. Schwalb, I did not want to hurt him.

"Q. 238. Because you did. You were afraid that if you put real bullets in it you would kill him, that is the reason, isn't it? A. If he had started to hit me, and if I had real bullets in that gun I may have killed him.

"Q. 239. You were afraid, Mrs. Schwalb, that you might kill that man if you put bullets in there, weren't you? A. If he had started after me and there had been bullets in that gun, I'm afraid he would have been killed.

"Q. 240. You would have let him have it. Now, things had gotten just that bad between you and your husband, hadn't they, and that is the situation yours and his matters were in right now, aren't they? A. (The witness did not answer the question.)

"Q. 241. An incident of that kind is liable to happen at any time, isn't it, Mrs. Schwalb? A. No.

"Q. 242. Well, you say your husband had no business being afraid of that gun because you had

blanks in it, that is what you testified to, is it? A. No, I didn't say that.

"Q. 243. You didn't tell him it had blanks in it, did you? A. No, sir, I did not.

"Q. 244. You were bent and determined on making him listen to every word you said on that occasion? A. I was.

"Q. 245. And you, you went down there and you went in that tourist court and you held that gun on him for how long? A. About forty-five minutes.

"Q. 246. About forty-five minutes? A. That is right.

"Q. 247. Did you use any curse words while you were h-l bent and determined on making him listen to you? A. I couldn't say whether I did, or not.

"Q. 248. Well, now, wait a minute. Now, if this is an exception, tell us what kind of language you used on that occasion, Mrs. Schwalb? A. I could not repeat it.

"Q. 249. Did you call him a s-n of a b-h, then? A. I could not say whether I did or not.

"Q. 250. What else? A. I told Mr. Schwalb what I had in my heart, the way he treated his children, he had not seen his children for weeks.

"Q. 251. Yes, Ma'am; and you used all sorts of profane, filthy language, didn't you? A. I did not. To the best of my knowledge, I did not.

"Q. 252. Did you use the term s-n of a b-h on that occasion? A. I did not.

"Q. 253. Oh, you did not? A. To the best of my knowledge, I did not.

"Q. 254. Well, are you denying that you did, Mrs. Schwalb? A. I am not denying I did; I am not denying I did not.

"Q. 255. Were you drinking when you went down there? A. I was not.

\* \* \* \* \* \*

"Q. 280. Well, you told him what you had in your heart down there at the Midtown Motel, didn't you? A. I did.

"Q. 281. You took forty-five minutes doing it, didn't you? A. I did.

"Q. 282. And now, Mrs. Schwalb, you said, you testified, didn't you, that you were afraid of that man down there, weren't you, and that is the reason you had that gun? A. Mr. Schwalb?

"Q. 283. Yes. A. Yes, I am afraid of him.

"Q. 284. Well, I am talking about on this occasion, didn't you testify that he picked up an ash tray and threatened you with it,—or an ash stand? A. He did.

"Q. 285. He did. And then you went out—that is when you went out to protect yourself and got that gun, isn't it? A. Yes.

"Q. 286. Well, Mrs. Schwalb, if you were scared of him, like you have just sworn you were, why didn't you get in that automobile and leave there—Why didn't you get in your automobile and leave that place? A. Because I hadn't had my say, he was the only one that had a say.

"Q. 287. Oh, you thought that if you could get a weapon a little bit more dangerous than his, you would get in your forty-five minute speech, is that right? A. I got in my forty-five minute speech.

"Q. 288. And you didn't walk back in there and tell him you had any blanks in that pistol? A. I sure didn't.

"Q. 289. You say he was pretty well agreeing with everything you said? A. He sure was, and he listened.

"Q. 290. He did? A. He sure did, for the first time in 17 years.

"Q. 291. Well, do you blame him? A. I don't blame him at all.

"Q. 292. You would listen, too, if somebody had a gun barrel down your throat, wouldn't you lady? A. I would, too.

"Q. 293. You were h-l bent and determined he was going to do just that, weren't you? A. I was."

The Chancellor found the facts in reference to this incident as requested by complainant, but found "that the gun in the possession of defendant was loaded with blanks, and that she had no intention of killing the complainant."

We think that the question of whether the gun was loaded with blanks or with live ammunition, and whether or not Mrs. Schwalb intended to kill her husband, are wholly immaterial. By her own admission, he did not know that the gun had blanks in it, if in fact it did; and she did, she says, threaten to kill him in a most menacing manner. He certainly was justified in believing, under the circumstances, that she meant just what she said. The Chancellor's opinion that the defendant, Mrs Schwalb, was not guilty of such cruel and inhuman treatment or conduct towards her husband, Mr. Schwalb, as rendered cohabitation unsafe and improper, is, we think, contrary to the clear weight and preponderance of the evidence. This occurrence alone is, in the opinion of this Court, sufficient to entitle Mr. Schwalb to a divorce.

About a week after the tourist court incident, Mrs.

Schwalb went to her husband's place of business and created another one of her "scenes". On this occasion she assaulted both Mr. Schwalb and one of his employees, Roberts Sipes, with empty bottles, although Mr. Schwalb was able to take the bottles from her before she succeeded in striking either of them. At this time she was demanding money from Mr. Schwalb which he failed or refused to give to her. This attack, as stated, was witnessed by a third party, Robert Sipes, an employee of complainant, who testified in the case and corroborated Mr. Schwalb. He, also, corroborated the use of profane and vulgar language by Mrs. Schwalb. Sipes said that on this occasion, Mrs. Schwalb said to Mr. Schwalb that he "didn't have a d-n thing when she married him and wouldn't have a d-n thing when she got through with him."

The Chancellor found the facts relative to this incident as requested by complainant.

In December, 1953, Mrs Schwalb went to her husband's office during his absence and carried away a diary which he was keeping with reference to his troubles with her. The next day, she returned, pilfered his desk and carried away certain letters addressed to him. The Chancellor so found, and Mrs. Schwalb admitted as much. In February, 1954, according to the testimony of Mr. Schwalb and an officer of the Tennessee Highway Patrol, Mrs. Schwalb tried to get Mr. Schwalb arrested because he had, on several occasions, borrowed automobiles from a used car dealer and driven them without proper license plates. The highway patrol declined to make the arrest; whereupon Mrs. Schwalb tried to prevent the automobile dealer, one Euther Davidson, from lending automobiles to her husband. Failing in this, she attempted to have the insurance carried by Davidson on his vehicles cancelled. Mrs. Schwalb admitted that she called the high-

way patrol about the matter, and admitted that she tried to get Davidson to stop lending the cars to her husband, and admitted that she telephoned Davidson's insurance agent at Humboldt and tried to get the agent to cancel his insurance. The only part of it that she denied was, that she tried to get the highway patrol to arrest her husband. Sergeant B. A. Cummings of the highway patrol, a wholly disinterested witness, however, testified positively, both on direct and cross-examination, that Mrs. Schwalb did want her husband arrested.

■ The argument is made that it was improper for either the Chancellor or this Court to consider matters that occurred after the separation. There is no merit in this contention. Not only was it proper for the Chancellor to consider matters which occurred after the separation and before the filing of the bill for divorce, but, in addition, he could properly have considered matters which occurred after the filing of the bill if same had been incorporated therein by amendment or supplemental bill. Anderson v. Anderson, 3 Tenn. Civ. App. 423.

■ As to whether or not the acts and conduct of defendant constituted cruel and inhuman treatment within the meaning of our divorce laws, we think the authorities are clear. In Tennessee, cruelty as a cause of divorce is the willful, persistent causing of unnecessary suffering, whether in realization or apprehension, whether of body or mind, in such a way as to render cohabitation dangerous and unendurable. Gardner v. Gardner, 104 Tenn. 410, 412, 58 S. W. 342; Russell v. Russell, 3 Tenn. App. 232, 245; Meeks v. Meeks, 27 Tenn. App. 279, 285, 179 S. W. (2d) 189.

Cruel and inhuman treatment, within the meaning of Tennessee divorce laws, is not confined to acts of physical violence. Gardner v. Gardner, 104 Tenn. 410, 412, 58

S. W. 342; Meeks v. Meeks, 27 Tenn. App. 279, 286, 179 S. W. (2d) 189; Garvey v. Garvey, 29 Tenn. App. 291, 299, 203 S. W. (2d) 912.

■ A systematic and continued use by one spouse of profane and unkind language toward the other, causing mental suffering and threatening permanent injury to his or her health, entitles the offended spouse to a divorce on the ground of cruel and inhuman treatment, where the offended spouse is a person of refinement and emotional sensibilities, especially when coupled with other misconduct. 27 C. J. S., Divorce, Sec. 28, p. 559; Garvey v. Garvey, 29 Tenn. App. 291, 300, 203 S. W. (2d) 912.

In the case of Dorothy R. Lowenthal v. Adrian Lowenthal decided by this Court December 2, 1953, which case has not yet been reported, but in which certiorari has been denied by the Supreme Court, the opinion of this Court in that case, written by Carney, J., says in part:

"As stated above, we have found that the evidence preponderates in favor of the insistence of the defendant husband and that the salient and determinative allegations of his cross bill are sustained by the proof, to wit: That the actions of his wife in constantly nagging and fussing at the husband, insisting that he spend over and above what he thought his financial circumstances would permit, buying expensive articles of furniture, nagging him about his association with his close friends; constantly harassing him for nursing and caring for his mentally ill sister; and in referring to her husband, the cross complainant, as a son of a bitch and sometimes as a God damn Jew son of a bitch, and in calling him such names to his friends and his clients or to their mutual friends and relatives, under the circumstances as proven in this case, do constitute cruel and inhuman treatment

within the meaning of section 8427 of the Code of Tennessee as construed by the cases of Meeks v. Meeks, 27 Tenn. App. 279, 179 S. W. (2d) 189, and other cases therein cited.''

█ In the final decree in the instant case entered in the lower court, the Chancellor found as a fact and adjudged that neither the complainant, Daniel Schwalb, nor the defendant, Ruth Hogue Schwalb, had been guilty of such cruel and inhuman treatment or conduct toward the other as renders cohabitation unsafe and improper; and his award of separate maintenance in favor of cross complainant, Mrs. Schwalb, is expressly predicated upon his inherent authority and jurisdiction as Chancellor. Of course, this decree is suspended by the appeal and the cause is being heard de novo in this Court, as stated above. If it be contended that this judgment had the same effect as a holding that both parties were entitled to a divorce, thus annuling the right of either to a divorce, while it is true that if the conduct of both parties has been such as to furnish grounds for divorce, neither party is entitled to relief; nevertheless, to bar a petitioning husband's right to relief, the defending wife must prove a marital offense on the part of her husband which would have entitled her to a divorce if she had asked for it. Douglas v. Douglas, 156 Tenn. 655, 660, 4 S. W. (2d) 358; Brewies v. Brewies, 27 Tenn. App. 68, 72, 178 S. W. (2d) 84; 17 Am. Jur. Pr. Divorce and Separation, Sec. 234, p. 268.

█ If it be argued that the beating which Mr. Schwalb administered to Mrs. Schwalb in February, 1952, about sixteen months before the parties separated, would operate as a bar to his right of maintaining the present suit for divorce, there are two answers to this objection. In the first place, the Chancellor expressly adjudicated

that the complainant, Mr. Schwalb, as cross defendant, had not been guilty of such cruel and inhuman treatment or conduct as rendered cohabitation unsafe and improper, and no appeal was taken by Mrs. Schwalb from this adjudication. In the second place, Mrs. Schwalb continued to live with Mr. Schwalb after that occurrence and thereby forgave or condoned his improper conduct on that occasion. While it is true that cruel and inhuman treatment as a ground of divorce cannot be condoned in the same sense that adultery as a ground of divorce may be condoned, and thereby in legal contemplation wiped out, nevertheless, there is a principle that cruel and inhuman treatment may be forgiven and cannot thereafter be relied upon as a ground for divorce, except upon some revival or new act which brings back into life the former misconduct previously forgiven. McClanahan v. McClanahan, 104 Tenn. 217, 228, 56 S. W. 858; Garvey v. Garvey, 29 Tenn. App. 291, 203 S. W. (2d) 912; Humphreys v. Humphreys (Tenn. App.), 281 S. W. (2d) 270, certiorari denied by Supreme Court, Dec. 17, 1954.

It is the opinion of this Court that the clear preponderance of the evidence in the record of this cause, preponderates against the finding of fact by the learned Chancellor that the defendant had not been guilty of such cruel and inhuman treatment or conduct towards the complainant, Daniel C. Schwalb, as renders cohabitation unsafe and improper. Even on the facts as found by the Chancellor, we think his conclusion or ruling of law was erroneous. The record indicates that his decision denying a divorce to complainant was induced by his solicitude for the future of the children of Mr. and Mrs. Schwalb. His solicitude, in that regard is highly commendable; but the laws of Tennessee do not warrant the denial of a divorce for that reason, where a party to a divorce suit has

established one or more of the grounds for divorce set out in the code. Appellant's first assignment of error "That the Chancellor erred in finding that defendant had not been guilty of such cruel and inhuman treatment or conduct towards complainant as rendered it unsafe and improper for complainant to cohabit with and be under her dominion and control", is therefore sustained.

The second assignment of error is that "The Chancellor erred in finding that defendant had not attempted complainant's life by means showing malice".

According to the contention of complainant, there were three such attempts on his life made by the defendant, as reflected in the record of this cause. The first was when the defendant held a butcher knife at his throat and threatened his life; and the second was on the occasion when the defendant invaded his room with a pistol which he grabbed out of her hand, and, with the assistance of their daughter, Diane, subdued her. The Chancellor found against the contentions of complainant on both of these instances and we see no reason to disturb his ruling so far as these two instances are concerned.

The third instance is the one referred to in the record and in the briefs of the parties here, as the Hatton Street incident, where Mrs. Schwalb attempted a head-on collision with an automobile driven by Mr. Schwalb in another automobile driven by her, going at a rapid rate in the opposite direction. His contention is that but for his running out of the street into the yard of a person who resided on the street in that section, she would have accomplished her purpose and would or might have killed him. This incident occurred in July, 1953. Mr. Schwalb's version of the occurrence is as follows:

"Q. 137. Now, referring to the Hatton Street, Mr. Schwalb, would you go back and tell us again

about what occurred on that occasion? A. I had had lunch at the State Cafe on Poplar Street and had left that restaurant and had gone up Middleton and turned into Hatton, coming towards town,—that is, going east, and I was about a half a block into Hatton Street. I saw Ruth coming across, or turn into Hatton Street, I believe she came directly down Hatton Street. She was going at a fast rate of speed because I could hear the engine of her car. I sensed that her gear was not changed in the car because of the noise that the motor was making.

"Q. 138. Now, let's see, Mr. Schwalb, as I understand it, you were going—A. East.

"Q. 139. East on Hatton and she was coming in an opposite direction, is that correct, sir? A. That is right.

"Q. 140. At a high rate of speed, is that right? A. Yes, sir.

"Q. 141. All right, now what happened then? A. Then Ruth started turning directly into my automobile, and I saw that if I didn't get off the road or she didn't turn back and do it quick, we were going to have a head-on collision, and at the very last second I turned my automobile very sharp to the right—

"Q. 142. (Interrupting) Will you speak a little louder, Mr. Schwalb, I believe the Court is having some trouble hearing you? A. As we were approaching each other, I knew if I didn't turn or she didn't go back to the other side of the street,—her side of the street, that we were going to have a head on collision. I cut my wheel to the right as hard as I could and went clean off the road and up into some people's yard there in order to avoid the accident, and Ruth continued on down the street before she

could stop her automobile and then she threw her car into reverse and came back and cursed and said I could come by and get those d-n children, that she had decided to leave. That is not the exact phraseology that she used, but that is the best that I can remember.

"Q. 143. You mean, that she was headed right towards you as if to deliberately crash into your automobile? A. That is so. She would have collided with my automobile if I hadn't turned off the road.

"Q. 144. Were you over on your side of Hatton Street? A. Yes, sir.

"Q. 145. And she cut from her side, which was the opposite side, over on your side and right at you, is that right? A. That is right.

"Q. 146. Did you have to jump a curb to get up in this man's yard, or how did you do that? A. There is no curb on Hatton Street, but I did go into the yard across the sidewalk,—leading to that house. As a matter of fact, my bumper was only a foot or two from the—whatever house it was I stopped at, from the porch of the house.

"Q. 147. I didn't get that. Your bumper was what? A. My bumper was only a foot or two from the front porch of the house, whatever house it was that I ran up in the yard of. These houses set about 10 feet back off the street, of Hatton."

Mrs. Schwalb admitted on direct examination that this incident occurred. Mrs. Schwalb's version, as brought out by cross examination, is as follows:

"Q. 204. All right, now, Mrs. Schwalb, I want to ask you about that Hatton Street incident. You know what I'm talking about, don't you? A. Yes, sir.

"Q. 205. You testified on direct examination that you stopped your husband on that occasion, didn't you? A. Yes, sir.

"Q. 206. How did you stop him, Mrs. Schwalb? A. He thought I was going to run into him.

"Q. 207. Oh, Well, tell us why he thought you were going to run into him. A. I didn't hear you.

"Q. 208. What did you do to make your husband think you were going to deliberately crash him? A. I just went straight at him.

"Q. 209. You went straight at him just like he said you did, didn't you, Mrs. Schwalb? A. I certainly did.

"Q. 210. All right. Didn't you know that if you ran your automobile deliberately into his automobile that you might kill him? A. I didn't have any intention of running my automobile into Mr. Schwalb's automobile at any time.

"Q. 211. Well what were you running your automobile right at him for, of you didn't intend to hit him? A. To stop him.

"Q. 212. You were going to stop him if it involved a head on crash of those two vehicles, weren't you? A. No.

"Q. 213. You weren't. Well, when did you plan to change the course of your vehicle? A. I changed it.

"Q. 214. You did. He changed his, too, didn't he? A. He sure did.

"Q. 215. He went up into that yard, didn't he, Mrs. Schwalb? A. He sure did.

"Q. 216. And that is what he had to do to get out of your way, wasn't it? A. Yes, sir; and he stopped, too.

336

"Q. 217. He stopped, too; and you were determined to see that he did stop, weren't you? A. I was.

"Q. 218. Because he ignored you there around about the State Cafe? A. That is right.

"Q. 219. And you were going to stop him if it killed him, weren't you? A. No, I was not going to kill him. If I had wanted to hit Mr. Schwalb's car I could have hit him.

"Q. 220. Oh, you could have run up into the yard and hit him, is that right? A. Yes, if there had been anything like that in my mind, I could have."

In disposing of the complainant's request for additional findings of fact with reference to this incident, which is paragraph 9 of the said request, the Chancellor ruled as follows:

"In refusing to find section 9 of complainant's request, the court is of the opinion that the proof fails to show whether the defendant attempted to drive her car into the car of complainant or whether she was trying to drive in front of him so that she might make some request or demand."

In this, also, we think the learned Chancellor was in error.

Malice is implied, when the act is committed deliberately, and is likely to be attended with dangerous consequences. In such cases, the malice requisite to constitute murder will be presumed; for the law implies that the natural or probable effect of an act deliberately done, is intended by its actors. Wharton's Criminal Law, 359; Warren v. State, 44 Tenn. 130.

An unintentional killing constitutes murder in the second degree, where the death results from a consciously unlawful act, done intentionally and with knowledge on the part of the perpetrator that the act was directly

perilous to human life. There exists, in such case, that high degree of conscious and wilful recklessness which evinces malignity of heart that constitutes malice. Tarver v. State, 90 Tenn. 485, 16 S. W. 1041.

So, if a person driving a cart or other carriage happens to kill, and it appears that he saw, or had timely notice of, the mischief likely to ensue, and yet drove on, it will be murder. Lee v. State, 41 Tenn. 62.

The above-quoted authorities deal with murder trials. In the opinion of this Court, if Mr. Schwalb had not turned his car off the street so as to avoid the collision which was imminent, and if he had been struck and killed by the collision, Mrs. Schwalb would have been guilty of murder. That, in the opinion of this Court, certainly constitutes an attempt on the life of complainant and cross defendant, which involved malice. The Chancellor was, therefore, in error in his ruling with reference to this contention of the complainant, and the second assignment of error must, also, be sustained.

. The third assignment of error is that, "The Chancellor erred in finding that defendant was not guilty of habitual drunkenness contracted after the marriage of the parties." On this subject, the finding of the Chancellor was, "The Court finds that the defendant drank some intoxicating liquors, but the proof fails to show that it was done to excess." There is much evidence in the record which indicates that this finding of fact by the Chancellor is an understatement. In view of the fact, however, that the complainant, himself, testified, "Now, I want to say my wife did not get stupid, or drunk, but she continuously sipped on alcohol beverages and she kept—if she didn't finish a highball she would keep it in the icebox or refrigerator and every so often she would go back and get it," and especially in view of the further

fact that this Court has already sustained two of appellant's assignments of error, either or both of which entitles him to a decree of divorce in this court, it seems unnecessary to go further into .this assignment of error. Same is overruled, and the action of the Chancellor with reference thereto, is approved.

The fourth assignment of error is that, ''The Chancellor erred in granting separate maintenance, or other relief to defendant.''

In view of the action heretofore taken with reference to assginments of error, one and two, disposition of this fourth assignment of error is automatically taken care of by express provision of the statutes of Tennessee. Section 8449 of the Code provides:

''If the bonds of matrimony be dissolved at the suit of the husband, the defendant shall not be entitled to dower in the complainant's real estate, nor to any part of his personal estate, in case of his intestacy, nor to alimony.''

The fourth assignment of error must, therefore, be sustained.

Of course, both the Bon Air Subdivision property and the Burkett Street property, title to which is held by complainant and defendant as tenants by the entireties, will become their property held as tenants in common after the granting of the divorce in this Court. This cause can properly be remanded to the Chancery Court of Madison County for disposition of the respective interests of said parties in such property held as tenants in common, either by sale for partition and division, by division in kind under proper appraisals as to the respective values of the two properties, or by purchase or sale approved by the Court.

The fifth assignment of error is that, ''The Chan-

cellor erred in awarding the custody of the minor children of the parties to defendant.'' In view of the fact that these children were, at the time of the divorce decree, respectively 16 years and 14 years of age, and in view of the fact that both of them expressed a desire to continue to live with their mother, we can find no reason for sustaining this assignment of error.

When the cause is remanded to the Chancery Court of Madison County, the Chancellor may make specific provision for the support of these children by their father, if he deems such action necessary or advisable; and he may retain the cause in court, for future orders with reference thereto. Indeed, under the provisions of Sections 8446 and 8454 of the Code, the cause would be retained for future action independent of an express retention of the cause.

In any event, the father will remain liable for support of his minor children, even though their custody has been awarded to the mother. Graham v. Graham, 140 Tenn. 328, 204 S. W. 987; Carey v. Carey, 163 Tenn. 486, 43 S. W. (2d) 498; Madison v. State, 163 Tenn. 198, 42 S. W. (2d) 209. Under the provisions of Section 8463 of the Tennessee Code, the mother and father will remain equally and jointly charged with the care, nurture, welfare, education and support of such children; and any dispute between them as to the proper apportionment of expenses in that connection, may be settled by the courts of this State under equitable principles. Rose Funeral Home, Inc., v. Julian, 176 Tenn. 534, 144 S. W. (2d) 755, 131 A. L. R. 858; Merrill v. Merrill, 188 Tenn. 10, 216 S. W. (2d) 705, 7 A. L. R. (2d) 488; Baker v. Baker, 169 Tenn. 589, 89 S. W. (2d) 763.

In order to carry out the provisions of this opinion, a final decree granting a divorce to appellant, Daniel C.

Schwalb, against appellee, Ruth Hogue Schwalb, will be granted in this Court, on the ground that the defendant, Ruth Hogue Schwalb, has attempted the life of complainant, Daniel C. Schwalb, by means showing malice, and on the ground that the defendant, Ruth Hogue Schwalb, has been guilty of such cruel and inhuman treatment or conduct towards complainant, Daniel C. Schwalb, as renders cohabitation unsafe and improper. The cause will then be remanded to the Chancery Court of Madison County, Tennessee for disposition or settlement of the rights of the parties to this cause in and to properties held by them, heretofore, as tenants by the entireties, and for control and supervision of the support and maintenance of the two minor children of the parties to this cause, whose custody has heretofore been awarded by the Chancellor to the defendant, Ruth Hogue Schwalb, their mother, such award of custody being subject to future modification or change as circumstances may warrant.

The costs of this cause, as well as those of the lower court, will be paid by the complainant and appellant, Daniel C. Schwalb and his sureties on the cost and appeal bonds.

Avery, P. J. (W.S.), and Carney, J., concur.