Leroy Ernest THOMPSON, Plaintiff/Appellee,

v.

Wanda Marie Taylor THOMPSON, Defendant/Appellant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 18, 1990.

On Petition for Rehearing May 4, 1990.

Appeal Dismissed by Supreme Court Oct. 1, 1990.

---

Sandra Jones, Nashville, for defendant/appellant.

William E. Farmer, Lebanon, for plaintiff/appellee.

## OPINION

KOCH, Judge.

This appeal involves the dissolution of a thirty-three year marriage after the wife threatened to shoot her husband with a pistol. The husband sought a divorce in the Chancery Court for Wilson County. The trial court heard the case without a jury and, after the wife voluntarily dismissed her complaint for separate maintenance, granted the husband a divorce on the grounds of cruel and inhuman treatment. The wife has appealed, asserting that the husband was not entitled to a divorce because he was an adulterer. She also takes issue with the trial court's division of the marital estate and with its refusal to make a separate award to defray her legal expenses. We affirm the trial court's judgment.

### I.

Leroy Ernest Thompson and Wanda Marie Taylor Thompson were married in Hinton, Oklahoma in May, 1955. They are now both 54 years old and have three grown children. Mr. Thompson was employed by DuPont during most of the marriage. Mrs. Thompson worked during the early part of the marriage but, except for occasional jobs, was a homemaker and mother. The parties moved to Wilson County in 1972 when Mr. Thompson was transferred to the DuPont plant in Old Hickory.

The marriage was punctuated with discord caused by Mrs. Thompson's religious disapproval of her husband's drinking and his absences from home while on business. They had arguments that sometimes became violent. Mr. Thompson admitted that he slapped and pushed Mrs. Thompson on several occasions and that he drank excessively prior to 1976. However, he insisted that he had kept his drinking under control for the last twelve years of the marriage except for "a couple of stunts" in 1983 and 1984.

Mr. Thompson had a brief affair in mid-1981. Mrs. Thompson was aware of the indiscretion. In 1983, Mr. Thompson brought up the subject of divorce and suggested that the parties seek marriage counseling. At that time, Mrs. Thompson believed that their marital problems stemmed from Mr. Thompson's "drinking problem," his "fidelity," and the "lack of communication on pertinent relevant subjects." For his part, Mr. Thompson complained of their "non-open relationship," Mrs. Thompson's "jealousy, suspicion, [and] distrust," and her continuing to make him pay for past mistakes. According to Mr. Thompson, the marriage counseling was not successful because during their remaining time together, Mrs. Thompson would periodically threaten him with divorce and financial ruin.

Mr. Thompson had to take early retirement in December, 1986 because DuPont was eliminating his job in a reorganization. Mr. Thompson went to work as a sales representative with Reemay, Inc., the company that acquired the plant where he had been working. His new job required him to increase his business travel, much to Mrs. Thompson's dislike.

In late 1987, a childhood friend told Mr. Thompson that another friend, Jane Llewellyn Thomason, was going through a divorce. Mr. Thompson began making long distance telephone calls to Ms. Thomason and, in early 1988, began to visit her in Oklahoma when he was travelling on business.

Mrs. Thompson became very suspicious because Mr. Thompson was "gone somewhere every night of the week" and because he was "preoccupied completely and totally absorbed with his appearance and with himself." While she did not know whether Mr. Thompson was seeing another woman, Mrs. Thompson "felt ... that's where we were headed, and I [did not] want to go through that all over again."

Mrs. Thompson believed that "if I wanted a marriage I had to get his attention, I had to let him know that this was not going to be this way, that ... he was going to at least give me the dignity of talking to me about it, and he was going to tell me what it was that was a problem." She told Mr. Thompson that she was very unhappy, but

Mr. Thompson would not discuss the matter with her.

Mr. Thompson arrived home late on March 31, 1988. Mrs. Thompson met him at the door demanding to know where he had been. When Mr. Thompson made light of the question, Mrs. Thompson ordered him to sit at the counter in the kitchen. Then she produced a loaded .357 magnum pistol and, pointing the pistol at him, began to scream, swear, and demand to know what woman he had been running around with.

Mrs. Thompson held Mr. Thompson at gunpoint for over two hours. At one point, Mr. Thompson told Mrs. Thompson that he needed to use the bathroom. Mrs. Thompson cocked the trigger and said, "[Y]ou bastard ... if you so much as move ... I'm going to shoot you right in the middle of your guts and I'm going to watch blood run down your leg, onto the floor and form a puddle, and watch you lay [sic] there and die in it." Mr. Thompson finally talked Mrs. Thompson into laying down the pistol. Later that night, he unloaded and hid it along with the other shells in the house.

Mr. Thompson and Mrs. Thompson began to talk about getting a divorce after the incident with the pistol. After he decided that he wished a divorce, Mr. Thompson asked his daughter and her husband to be present when he informed Mrs. Thompson of his decision. On May 1, 1988, after Mrs. Thompson returned from church, Mr. Thompson told her that he wanted a divorce. Mrs. Thompson became angry because her daughter and son-in-law were present and, starting toward the bedroom where the pistol had been kept, stated, "I want him out of my house, I'm going to get my gun." Mr. Thompson left the house and never returned while Mrs. Thompson was present. Mr. Thompson filed his divorce complaint on May 6, 1988. Mrs. Thompson filed a separate complaint five days later.

Mr. Thompson began seeing Ms. Thomason much more regularly, and they became romantically involved. Even though he was not divorced, Mr. Thompson married Ms. Thomason in a civil ceremony in Carson City, Nevada on August 1, 1988. They then began living together as husband and wife in an apartment in Nashville. The marriage was later annulled on December 20, 1988 by the district court in Carson City.

Mrs. Thompson became upset and embarrassed when she learned of Mr. Thompson's marriage. She and her sister began to spy on the couple. After obtaining copies of the marriage papers, she obtained a criminal warrant in the Davidson County General Session court charging Mr. Thompson with bigamous cohabitation. She also retained a new lawyer and, in December, 1988, filed an answer to Mr. Thompson's divorce petition. She also filed an amended complaint seeking only separate maintenance instead of an absolute divorce.

The trial court heard the case on January 19, 1989. During her cross-examination of Mr. Thompson, Mrs. Thompson's lawyer announced that her client "would like to non-suit her action" because she did not want a divorce for cruel and inhuman treatment. The trial court was rather surprised at this request but stated, "I don't know of anything I can do about that ... so I'll have to sustain the motion for non-suit." Shortly thereafter, the court noted that "[t]his case has taken a very strange turn of events this morning. As the case now stands, Mrs. Thompson is not from an affirmative standpoint, seeking any relief. She's simply asking that Mr. Thompson's divorce action be dismissed."

Later, the trial court noted in its memorandum opinion that:

The Court frankly is apprehensive of the fact that Mrs. Thompson saw fit to non-suit her cause of action in the middle of the trial, especially since the record reveals that she filed her original bill for divorce on the grounds of cruel and inhuman treatment prior to any knowledge that her husband has [sic] filed only five days prior thereto. The filing of her Petition would strongly indicate to the Court that at that time, she felt that the marriage was at an end, and at that time she was not aware of her husband's indiscretions with the lady from Oklahoma.

It is possible that the nonsuit filed by her was punitive in nature rather than desire to reconcile the differences in the marriage.

## II.

Mrs. Thompson first takes issue with the trial court's decision to grant Mr. Thompson a divorce. She asserts that Mr. Thompson provoked her conduct and, therefore, that she has made out a defense pursuant to Tenn.Code Ann. § 36–4–120(a) (1984). We disagree. Mr. Thompson's conduct, even though it was disgraceful and indefensible, did not warrant Mrs. Thompson's armed assault on her husband.

### A.

Mrs. Thompson's amended answer asserted four affirmative defenses to Mr. Thompson's amended divorce complaint. Her first defense was the "provocation" or "ill conduct" defense authorized by Tenn. Code Ann. § 36–4–120(a) (1984).[1] Her remaining defenses appear to be recrimination defenses in that they are predicated on the notion that Mr. Thompson was somehow barred from obtaining a divorce on the grounds of cruel and inhuman treatment because he was a bigamist and an adulterer.

■ We need not tarry long with Mrs. Thompson's defenses based upon Mr. Thompson's adulterous or bigamous relationship with Ms. Thomason after May 1, 1988. Adultery and bigamy are no longer complete bars to a spouse's right to seek a divorce on one of the grounds in Tenn.Code Ann. § 36–4–102 (1984) or one of the no-fault grounds in Tenn.Code Ann. § 36–4–101 (Supp.1989). *Fox v. Fox,* 676 S.W.2d 956, 958 (Tenn.1984); *Chastain v. Chastain,* 559 S.W.2d 933, 934–35 (Tenn. 1977); *Harwell v. Harwell,* 762 S.W.2d 140, 141 (Tenn.Ct.App.1988). Since Mr. Thompson's amended divorce complaint is based on Tenn.Code Ann. § 36–4–102(a)(1), recrimination-type defenses based on his conduct with Ms. Thomason after the pistol incident are not available.

■ However, Mrs. Thompson can defend against her husband's complaint for divorce using the "provocation" or "ill conduct" defense in Tenn.Code Ann. § 36–4–120(a). In order to succeed, she must show (1) that her actions were the justifiable result of her husband's ill conduct, *Chastain v. Chastain,* 559 S.W.2d at 934; *Stanfill v. Stanfill,* 742 S.W.2d 267, 270 (Tenn.Ct.App.1987), and (2) that her actions were not out of proportion to her husband's conduct. 2 H. Clark, *The Law of Domestic Relations in the United States* § 14.13, at 71 (2d ed. 1987); W. Garrett, *Tennessee Divorce, Alimony & Child Custody* § 7–7 (2d ed. 1984); *Gray v. Gray,* 220 Pa.Super. 143, 286 A.2d 684, 687 (1971); *Rabon v. Rabon,* 289 S.C. 49, 344 S.E.2d 615, 617 (1986).

■ The relative times of the spouses' misconduct become material when one spouse relies on the provocation defense. *Perry v. Perry,* 765 S.W.2d 776, 779 (Tenn. Ct.App.1988). The misconduct of the spouse seeking the divorce cannot be the grounds for the other spouse's provocation defense if it occurred after the misconduct on which the divorce complaint is based. *Thomasson v. Thomasson,* 755 S.W.2d 779, 786 (Tenn.1988); *Stanfill v. Stanfill,* 742 S.W.2d at 270; *Bush v. Bush,* 684 S.W.2d 89, 92 (Tenn.Ct.App.1984).

### B.

■ The trial court found that Mrs. Thompson's actions during the pistol incident created "a dangerous situation" and were those of "an emotional, disturbed person." Mrs. Thompson does not, and indeed cannot, dispute these findings. We have held in other cases that one spouse's armed threats against the other constitute cruel and inhuman treatment. *Kelly v. Kelly,* 679 S.W.2d 458, 460 (Tenn.Ct.App.1984);

---

**1.** Tenn.Code Ann. § 36–4–120(a) provides:

   If the cause assigned for a divorce be any of those specified in § 36–4–102, the defendant may make defense by alleging and proving the ill conduct of the complainant as a justifiable cause for the conduct complained of, and on making out the defense to the satisfaction of the court, the bill may be dismissed with or without costs, in the discretion of the court.

*Schwalb v. Schwalb*, 39 Tenn.App. 306, 321–26, 282 S.W.2d 661, 668–71 (1955). Thus, it cannot be seriously disputed that Mrs. Thompson's conduct on March 31, 1988 provided Mr. Thompson with grounds for a divorce on the grounds of cruel and inhuman treatment.

Mrs. Thompson's provocation defense is another matter. Much of the conduct she complains about is quite remote in time, some of it occurring six or seven years before the pistol incident. Mr. Thompson's conduct from late 1987 through March, 1988 might have warranted giving Mrs. Thompson an award for separate maintenance had she not non-suited her claim. However, it was not so egregious that it justified an armed confrontation during which Mrs. Thompson threatened to take her husband's life.

Mrs. Thompson's conduct was not a justified response and was disproportionate to Mr. Thompson's conduct. Therefore, the trial court properly found that she had failed to make out her provocation defense and that Mr. Thompson was entitled to a divorce on the grounds of cruel and inhuman treatment.

### III.

Mrs. Thompson also takes issue with the manner in which the trial court divided the parties' marital estate. She insists that the division was inequitable because the trial court did not award her a portion of Mr. Thompson's DuPont and Reemay pensions. We disagree. Mrs. Thompson received an equitable share of the marital estate.

### A.

Trial courts have broad discretion in dividing marital estates. *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn.1983). We customarily give their decisions great weight, *Edwards v. Edwards*, 501 S.W.2d 283, 288 (Tenn.Ct.App.1973), and are generally disinclined to disturb them unless the distribution lacks proper evidentiary support or results from an error of law or a misapplication of statutory requirements and procedures.

Tenn.Code Ann. § 36–4–121 (Supp. 1989) requires the trial court to divide marital property equitably in accordance with the statutory factors without regard to fault. *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn.1988). The trial court's distribution need not be equal to be equitable. *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn.Ct. App.1988).

While the courts must include all of the parties' marital property in the marital estate, they are not required to award both parties an interest in each piece of marital property. Tenn.Code Ann. §§ 36–4–121(a) and 36–4–121(f)(1) permit trial courts to divest and reinvest title to property and to make distributive awards in order to achieve equity. Thus, unless the facts require otherwise, the courts generally judge the fairness of a property division by its final results.

### B.

The Thompsons' marital estate consisted of a 51 acre farm valued at $200,-000, farm equipment and tools worth $9,660, and other personal property, including Mr. Thompson's retirement accounts, worth approximately $114,868. The trial court divided the estate by awarding each party a half interest in the farm and farm equipment and by awarding $62,620 of the personal property, including his retirement accounts, to Mr. Thompson and $52,248 to Mrs. Thompson. The trial court also gave Mrs. Thompson the use of the house for twelve months and required Mr. Thompson to pay approximately $8,400 during the year for the mortgage, taxes, insurance, and maintenance.

In addition to this distribution, the trial court directed Mr. Thompson to designate Mrs. Thompson as the beneficiary of one-half of the proceeds of his life insurance policies. The trial court also ordered Mr. Thompson to pay Mrs. Thompson $300 per month as periodic support and $10,000 in rehabilitative alimony to be paid in ten monthly installments.

The net result of the trial court's decision is as follows:

|  | Husband | Wife |
|---|---|---|
| ½ interest in farm | $100,000 | $100,000 |
| ½ farm equipment | 4,830 | 4,830 |
| Personal property | 62,620 | 52,248 |
| Subtotal | $167,450 | $157,078 |
| Farm expenses for 1 year | (8,400) | 8,400 |
| Net | $159,050 | $165,478 |

The trial court included Mr. Thompson's pensions in the marital estate. Mrs. Thompson was not entitled to receive a portion of these pensions because she received other assets of similar value. We have reviewed the trial court's distribution in light of the factors in Tenn.Code Ann. § 36–4–121(c) and have determined that it is supported by the evidence and is equitable.

### IV.

Finally, Mrs. Thompson insists that the trial court should have awarded her additional funds to defray her legal expenses. We disagree. Mrs. Thompson received sufficient liquid assets with which to pay her attorney and is fully capable of earning additional income if necessary.

Making an additional award to defray a spouse's legal expenses in a divorce proceeding is discretionary with the trial court. *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn.1983); *Hardin v. Hardin*, 689 S.W.2d 152, 154 (Tenn.Ct.App.1983). The award is appropriate when the spouse is disadvantaged and does not have sufficient resources. *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn.Ct.App.1986).

Even though she is presently disinclined to work, Mrs. Thompson is able-bodied and employable. She has received $10,000 in rehabilitative support and will be receiving $300 a month in periodic support. She has also received $20,000 in liquid assets as part of the distribution of the property.

Based on the proof, we cannot conclude that the trial court erred by declining to award Mrs. Thompson additional funds with which to pay her lawyer.

### V.

We affirm the judgment and remand the case for whatever other proceedings may be required. We tax the costs of this appeal to Wanda Marie Taylor Thompson and her surety for which execution, if necessary, may issue.

CANTRELL, J., and JOE C. LOSER, Jr., Special Judge, concur.

### ORDER

PER CURIAM.

The appellant's request for the withdrawal of this Court's April 18, 1990 opinion and for an *en banc* hearing is denied.

### ON PETITION FOR REHEARING

The appellant has filed a petition for rehearing asserting three grounds for the reconsideration of our April 18, 1990 opinion. First, the appellant asserts that our opinion was based upon laws that were not in effect when the case was tried. Second, she asserts that we held that she could not rely on the "ill conduct" or "provocation" defense. Third, she argues that our opinion is contrary to *Cook v. Cook*, Shelby Law, 1989 WL 76305 (Tenn.Ct.App. 7–14–89).[1]

---

1. In addition to a rehearing, the appellant also seeks the withdrawal of our opinion and a hearing *en banc* in accordance with this Court's internal operating procedures. This request can only be decided by a majority of the judges of the Middle Section. Accordingly, our disposition of the petition for rehearing should not be viewed as disposing of the appellant's request for an *en banc* hearing.

The appellant's motion does not raise any new matter not already considered and is not well taken. Our opinion rests upon legal principles that were commonly known to the bench and bar when this case was tried. Rather than holding that the appellant could not assert a provocation defense, we agreed with the trial court's finding that the appellee's conduct prior to March 31, 1988 did not warrant the appellant's threatening to kill him with a loaded pistol. Finally, we did not deem the Western Section's decision in *Cook v. Cook* to be controlling in this case since the appellant voluntarily dismissed her complaint for divorce from bed and board.

It is, therefore, ordered that the petition for rehearing be denied at cost to the appellant.

/s/ Ben H. Cantrell
    BEN H. CANTRELL,
    JUDGE

/s/ William C. Koch, Jr.
    WILLIAM C. KOCH, JR.,
    JUDGE

/s/ Joe C. Loser, Jr.
    JOE C. LOSER, JR.
    SPECIAL JUDGE