IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 29, 2004 Session

## GRETHY HIRT v. ERNST H. HIRT

**Appeal from the General Sessions Court for Loudon County**
**No. 8450     William H. Russell, Judge**

—————————

### No. E2004-00354-COA-R3-CV - FILED FEBRUARY 8, 2005

—————————

Grethy Hirt ("Wife") filed for divorce from Ernst H. Hirt ("Husband") after twenty-seven years of marriage. The parties had five financial accounts. Two of these accounts clearly were marital property, were divided evenly by the Trial Court, and are not at issue on appeal. As to the three remaining accounts, the Trial Court concluded two were marital property with the third being Wife's separate property. After making these findings, the Trial Court distributed the property with Husband receiving 54% of the marital property, and Wife receiving the remaining 46%. Husband appeals claiming the Trial Court erred when it classified two of the accounts as marital property and the third as Wife's separate property. Both parties claim the Trial Court's overall distribution of the marital property was inequitable. We conclude the Trial Court properly classified the three accounts at issue and did not abuse its discretion when distributing the marital property. The judgment of the Trial Court is, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**General Sessions Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Robert G. Hinton, Lenoir City, Tennessee, for the Appellant Ernst H. Hirt.

Loren E. Plemmons, Lenoir City, Tennessee, for the Appellee Grethy Hirt.

# OPINION

## Background

This is a divorce case with the primary issues on appeal involving the Trial Court's classification of two financial accounts as marital property and a third account as Wife's separate property. The parties also challenge the Trial Court's overall distribution of the marital property, with both sides claiming the distribution was inequitable.

Wife filed a complaint for divorce alleging Husband was guilty of inappropriate marital conduct or, in the alternative, that irreconcilable differences had arisen between the parties. When the complaint for divorce was filed in September of 2001, Husband was 73 years of age, Wife was 62, and the parties had been married for over 27 years. Husband filed an answer denying he was guilty of any inappropriate marital conduct, although he did admit that irreconcilable differences had arisen between the parties. Husband also filed a counter-complaint for divorce alleging Wife was guilty of cruel and inhuman treatment as well as inappropriate marital conduct.

This was the second marriage for both parties. There are no children born of this marriage. Husband maintains citizenship in the United States and Switzerland, and Wife is a Dutch citizen. Husband retired in 1997 and was the sole wage earner while the parties were married. The parties were living in Tellico Village, Loudon County, Tennessee, when Wife filed for divorce. Wife has since moved to Georgia and Husband has moved to Mississippi. Husband is in very poor health and has a history of serious coronary artery disease and intermittent atrial fibrillation. Husband underwent quadruple bypass in 2000 and his cardiologist has opined that only 20% of Husband's heart currently is functioning.

Soon after the complaint was filed, an agreed order was entered disbursing $139,844.98 contained in a First Central Bank money market account which was opened using the proceeds from the sale of the marital residence. These funds, which are not at issue on appeal, were divided evenly between Husband and Wife and considered an advance on any final award by the Trial Court when distributing the marital property.

After a trial, the parties stipulated to and were declared divorced pursuant to Tenn. Code Ann. § 36-4-129.[1] The Trial Court then classified property as either marital or separate and distributed the property according to these findings. The parties had five separate financial accounts. Two of these were joint accounts maintained in the names of both Husband and Wife and were valued at $308,080 and $219,262. The Trial Court classified these two accounts as marital property

---

[1] Among other things this statute permits a trial court, upon stipulation, to declare the parties divorced as opposed to awarding a divorce to only one of the parties.

and divided them evenly, with each party receiving $263,671.[2] Neither party challenges the Trial Court's classification of these two accounts as marital property or the manner in which these accounts were divided. It is the remaining three accounts which form the primary dispute on appeal. These three accounts are:

> 1. Salomon Smith Barney account # 423-62348-13, which is an IRA held solely in Husband's name and valued at $261,486. The Trial Court concluded this account was marital property and divided it 60% or $156,891 to Husband, and 40% or $104,595 to Wife;

> 2. Salomon Smith Barney account # 423-27671-13, which was held in the names of Husband and his daughter, Heidi Kroptavich, as joint tenants with the right of survivorship. This account was valued at $182,723, and the Trial Court concluded it was marital property and divided it 60% or $109,634 to Husband, and 40% or $73,089 to Wife; and

> 3. Salomon Smith Barney account #572-00759-19-096, which was held in the names of Wife and her daughter, Collette Hutson, as joint tenants with the right of survivorship. This account was valued at $313,000, and the Trial Court awarded the entire account to Wife as her separate property after expressly finding "that [Husband] has failed to carry his burden of proof that he made a substantial contribution to the existing separate account of [Wife]."

The Trial Court's classification and distribution of the remaining property is not directly in dispute. As noted previously, the marital residence was sold after the divorce action was filed. Wife moved to Georgia and Husband moved to Mississippi. The parties used the proceeds from the sale of the marital residence toward the purchase of new homes once they relocated. In addition to the property distribution set forth above, Wife was awarded as her separate property her house in Georgia, 14.5 acres of land located in Arkansas, and any funds she held in bank accounts in Georgia. Husband was awarded as his separate property his Mississippi residence and any funds he held in bank accounts in Mississippi. Each party was awarded the personal property currently in their possession and the Trial Court divided the few remaining items of personal property which then were in dispute but which are not at issue on appeal.

Husband claims the Trial Court erred when it classified as marital property Salomon Smith Barney accounts #423-62348-13 and #423-27671-13. Husband also claims the Trial Court erred when it classified Salomon Smith Barney account #572-00759-19-096 as Wife's separate property. Husband's final issue is his claim that the Trial Court did not consider all relevant factors when distributing the marital property, thereby resulting in an inequitable distribution. While Wife

---

[2] One account contained 253,373.51 Euros. According to Husband, a correct conversion to U.S. dollars would result in this account being worth approximately $296,000, not $219,262. Whether this account is valued at $219,262 or $296,000 will not significantly impact the overall property distribution since this account was divided evenly between the parties.

agrees with the Trial Court's classification of the three accounts, she also claims that the distribution of the marital property was inequitable when considering the relevant factors.

## **Discussion**

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Before we discuss the Trial Court's classification and distribution of the three accounts at issue, we note the parties' factual agreement that Husband was the sole wage earner during the marriage, Wife served as homemaker, and neither party expected Wife to work outside of the home. Pursuant to Tenn. Code Ann. § 36-4-121(c)(5), when equitably distributing marital property a trial court should consider as one of the various factors the contributions of each party to the acquisition, appreciation, dissipation or depreciation of the marital or separate property, "including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role." On appeal neither party argues that the other did not fulfill his or her respective role, and the record certainly supports the conclusion that they both did just that. Therefore, we will discuss neither the testimony in the record pertaining to the parties fulfilling their wage earner/homemaker roles in the marriage nor the testimony relevant only to Wife's claim for alimony, a claim denied by the Trial Court and a decision not appealed by Wife.

We first must decide whether the Trial Court correctly classified the disputed property as either marital or separate property before we can determine whether the overall distribution of the marital property was equitable. As relevant to this appeal, Tenn. Code Ann. § 36-4-121(b) provides the following definitions of marital and separate property:

> (1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.… All marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property.

-4-

(B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

\* \* \*

(D) As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

\* \* \*

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986, as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent ….

Tenn. Code Ann. § 36-4-121(b).

Our Supreme Court had occasion to discuss the concepts of marital property and separate property in the recent case of *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002). In *Langschmidt*, the Supreme Court noted that in addition to the statutory provisions contained in Tenn. Code Ann. § 36-4-121(b), Tennessee intermediate appellate courts have recognized two methods by which separate property may be converted into marital property. *Id.* at 747. These two

methods are commingling and transmutation, which the Supreme Court noted have been described by this Court as follows:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur.... [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property.... The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (citations omitted).

One of the issues in *Langschmidt* was whether the husband's IRAs which had been established prior to the marriage were marital or separate property when the husband made absolutely no contributions to those IRAs during the marriage. The Supreme Court's resolution of this issue was summarized by this Court in *Smith v. Smith*, 93 S.W.3d 871 (Tenn. Ct. App. 2002) as follows:

> The supreme court … began its analysis by stating that "[r]etirement benefits accrued during the marriage clearly are marital property under Tennessee law." [*Langschmidt*, 81 S.W.3d] at 749. (citing Tenn. Code Ann. § 36-4-121(b)(1)(B); *Gragg v. Gragg*, 12 S.W.3d 412 (Tenn. 2000); *Cohen v. Cohen*, 937 S.W.2d 823 (Tenn.1996)). The court then stated that the issue was "whether a premarital IRA is a retirement benefit under Tenn. Code Ann. § 36-4-121(b)(1)(B)." *Id.* at 749. Because the premarital IRAs at issue were funded with premarital assets and did not represent deferred compensation during the marriage, the court concluded that "Husband's premarital IRAs are not retirement benefits under Tenn. Code Ann. § 36-4-121(b)(1)(B)." *Id.* at 749.

> After concluding that Husband's IRAs were not retirement benefits, the court determined that Husband's IRAs remained his separate property according to section 36-4-121(b)(2)(A) of the Tennessee Code. *Id.* at 749. This was due to fact that Husband owned the IRAs and funded them prior to the parties' marriage. *Id.*

The court then stated that the appreciation of the IRAs during the marriage could properly be considered marital property if "both parties 'substantially contributed to [the IRA's] preservation and appreciation.'" *Id.* (citing Tenn. Code Ann. § 36-4-121(b)(1)(B), -121(b)(2)(C)). In order to support a finding of substantial contribution, the court required some connection between the marital efforts of a spouse and the appreciation of the separate property. *Id.* at 746, 750. The court determined that the evidence failed to support a finding that "Wife substantially contributed to the preservation and appreciation of Husband's IRA assets." *Id.* at 750. Accordingly, the court held that "these IRA assets, including their appreciation during the marriage, are Husband's separate property under sections 36-4-121(b)(2)(A) and 36-4-121(b)(1)(B)" of the Tennessee Code. *Id.* at 750-51.

*Smith*, 93 S.W.3d at 877.

Keeping these principles in mind, we now turn to the Trial Court's classification of the three accounts at issue in this appeal. Much of the pertinent testimony at trial focused on the parties' finances and these three accounts. Wife was the first witness, and she testified that she and her first husband owned a subdivision, a duplex, the house in which they lived, and land in Arkansas. Wife received some of this property when she divorced her first husband. Most of these assets were sold over time with the proceeds being deposited into a bank account in Holland, which is where Wife moved after her first divorce. Wife originally opened this account in her name and her sister's name because Wife's daughter was a minor at that time. Once Wife's daughter was no longer a minor, her daughter eventually was added to the account and Wife's sister was removed. Wife also opened an account in Arkansas with Salomon Smith Barney ("SSB") using funds from her first marriage. This account also was in the names of Wife and her daughter. Wife stated that Husband did not contribute any money to these two accounts which Wife referred to as her "personal accounts."[3]

According to Wife, the parties' normal monthly bills were paid from a joint checking account funded entirely with Husband's earnings. Wife did not contribute any money from her two personal accounts toward operating the household, with the exception of two "loans" she made to Husband in the 1970's. According to Wife, she loaned Husband $10,000 from her personal account in Arkansas in January of 1974. Wife had Husband sign a promissory note evidencing this loan and the note was admitted into evidence at trial. Wife testified that Husband wanted to borrow another $10,000 in 1976. Wife claims Husband accompanied her to the bank and discovered that she

---

[3] Wife's reference to these accounts as her "personal" accounts certainly is not determinative of whether the accounts were her separate property. We use Wife's reference to these accounts as her personal accounts primarily because it assists in distinguishing between the several accounts at issue.

actually had $18,000 in the account. Husband then informed Wife that he wanted to borrow the entire amount, and she acquiesced.

Wife claimed Husband was upset because she would not give him all of the money contained in her "personal" accounts. Wife explained the reason she did not do this was to protect her daughter financially, even if it made Husband angry. Wife used the money in her personal accounts for taking care of her daughter, who lived for some time with Wife's sister in Holland. Wife used this money to pay for her daughter's schooling, medical bills, etc. Husband contributed nothing toward these expenses pertaining to Wife's daughter.

Husband had worked approximately ten or eleven years for a Dutch company called Uiterwoyk before the parties were married. Wife acknowledged that shortly after they were married, Husband told her that he had $40,000 in a pension account with Uiterwoyk. Wife went on to add, however, that she never saw any documentation verifying Husband's statement that he had $40,000 in that account prior to their marriage.

Approximately ten years after Husband and Wife were married, Wife assisted her mother in buying a house. Wife testified that it was decided her mother would pay 1/3 of the purchase price, and "I would pay 1/3, and my husband and I would pay 1/3." When the house was sold ten years later after Wife's mother passed away, Wife paid off a loan that Husband had made on the house with 1/3 of the remaining proceeds being deposited into a joint account of Husband and Wife, and the remaining 2/3 being deposited into Wife's personal account in Holland.

Wife testified that she had a stockbroker who assisted her with investing the money in the accounts she held with her daughter, although she sometimes would ask Husband whether he agreed with the stockbroker's advice. Wife claimed Husband made no financials decisions regarding her personal accounts, "except insofar as he would agree" with the stockbroker. After Wife filed for divorce, she moved to Georgia to be with her daughter. While in Georgia, Wife closed both of her personal accounts and combined them into one new account with SSB in Atlanta. The current value of this account is $313,000 and is the third account still at issue on appeal. Wife receives interest income on this account ranging from $500 to $1,500 per month. She also receives $554 per month in social security benefits.

With regard to the account held in the names of Husband and his daughter, Wife stated Husband added his daughter to that account shortly before Wife filed for divorce. Wife admitted she did not contribute any funds to any of the financial accounts except her two personal accounts. Wife further stated that Husband made no financial contributions to her two personal accounts. Wife never transferred money from her personal accounts into any of the other accounts.

The next witness was Husband who testified that he had worked for Uiterwoyk Corporation for eleven years before he married Wife. Husband continued to work for that company for approximately nine more years. When questioned about his IRA account, SSB account #423-62348-13, Husband testified this account initially was funded with "about $67,017… which was a

-8-

pension plan from Uiterwoyk Corporation prior to my marriage." In other words, Husband appeared to claim that the entire pension was earned prior to his marriage to Wife. However, on cross-examination Husband was questioned further regarding whether he continued to accrue pension benefits during the last nine or ten years of his employment with Uiterwoyk, during which time he was married to Wife. This questioning was as follows:

> Q. So, you are saying that you didn't earn any of the Uiterwoyk pension during the last ten years that you were employed there?

> A. No. I said – What I'm saying is that I worked for Uiterwoyk, had a pension plan. And when Uiterwoyk sold out, I took the pension plan, reinvested it and then rolled it over in 1984 into the IRA plan.

> Q. Right. And during half of the time that you worked for Uiterwoyk, you were married to Mrs. Hirt, were you not?

> A. That is correct.

Based on this testimony, it seems clear that Husband earned pension benefits during his entire tenure with Uiterwoyk, which would include the first nine or ten years he was married to Wife. We note there was no documentary evidence from Uiterwoyk or any other source introduced at trial showing the value of the pension at the time of the marriage, and this may be because such evidence no longer exists.[4] However, over the course of the years Husband maintained a handwritten ledger which listed the parties' various assets and liabilities. In 1981, approximately seven years after the parties were married, Husband indicated in the ledger that his pension was worth $22,945. In 1986, the ledger has an entry for "Pension Plan IRA" and indicates a value of $55,785.

After leaving Uiterwoyk's employment, Husband worked for a company called Ryan Walsh. Husband worked for Ryan Walsh from 1984 until 1996 and was married to Wife during this entire period of time. Husband testified he had a life annuity agreement with Ryan Walsh which eventually was worth $82,000. Husband stated he converted the annuity into cash and these funds were deposited into his IRA account. Husband also had $65,000 in a savings plan with Ryan Walsh, which he likewise deposited into his IRA account.

With regard to the account held in the names of Husband and his daughter, SSB account #423-027671-13, Husband testified on direct examination that this account contained only

---

[4] Husband also had an annuity with Uiterwoyk. When asked if he had any documentation showing the value of the annuity at the time of the marriage, Husband stated he was unable to obtain that type of information because the company is now "broke" and "out of business." We assume the same reason holds true as to why Husband had no documentation from Uiterwoyk regarding the pre-marital value of his pension.

premarital funds. According to Husband, he received $50,000 in U.S. dollars upon his divorce from his first wife. Husband claims he invested this money into long term certificates of deposit ("CD's") with the Rabo Bank in Holland in 1974 or 1975. Husband then claims that many years later and after the CD's had matured, he transferred these funds into SSB account #423-27671-13, which is currently held in his and his daughter's names.

The origin of the funds in SSB account #423-27671-13 seemed rather straight-forward based on Husband's testimony on direct examination. This result changed during cross-examination when Husband was questioned about his handwritten ledgers referenced above. The ledger for 1980 does not show an entry for the Rabo Bank, although by this time Husband claims to have had over $50,000 in CD deposits with that bank. However, the 1980 ledger does list two CD's with a total value of $42,104. The 1981 ledger entry no longer has any CD's listed, but does contain the first entry for the Rabo Bank and lists the amount of money being held there as $15,000. Suffice it to say, Husband's ledger entries do not square with his testimony on direct examination.

Documentation provided by SSB on account #423-27671-13 was entered into evidence at trial. This documentation is far from complete and details sporadic transactions for very limited periods of time between August of 1998 and February of 2003. Husband testified that every year he is required to take mandatory distributions from his IRA, SSB account # 423-62348-13. Husband testified that these mandatory distributions average between $10,000 to $12,000 annually. Returning to the documentation provided by SSB on account #423-27671-13, the records indicate that on December 14, 1999, there was a $15,000 deposit from Husband's IRA account which was described as the "normal distribution." Similarly, on September 25, 2001, there was a $9,600 deposit from Husband's IRA into account #423-27671-13, which also was described as the "normal distribution."

With regard to Wife's "personal accounts," Husband testified that for several years he advised Wife regarding which stocks to purchase and how to invest that money. Wife listened to Husband for a time, but in 1999 she refused to sell some stock and went against Husband's advice. Husband stated that soon thereafter, the value of the stock declined significantly.

Husband receives social security retirement benefits in the amount of $1,575 per month and also receives a pension from his last employer in the amount of $240 per month. As noted, Husband also receives mandatory IRA distributions averaging somewhere between $10,000 to $12,000 each year. Husband testified that he is selling his house in Mississippi because of his poor health and intends to move into an assisted living center. Husband has investigated the cost of various assisted living centers in the area where he lives, and they cost a minimum of between $3,000 to $4,500 per month.

The Trial Court concluded Husband's IRA account valued at $261,486 was marital property. *Langschmidt* and *Smith*, *supra*, make clear that an account such as an IRA which is funded entirely with pre-marital assets remains separate property. In addition, when the appreciation in the

value of the account is entirely market driven, then the appreciation likewise remains separate property. *See Langschmidt*, 81 S.W.3d at 745-747; *Smith*, 93 S.W.3d at 877.

When marital funds are mixed with separate property, matters can get more complicated. In *Smith*, the husband had six IRAs, two of which had been partially funded with marital dollars.[5] The premarital funds in these two accounts consisted of bonds with fixed interest rates and this allowed husband's accountant to determine the value of the accounts attributable to premarital funds, and the amount properly attributable to the marital funds. As a result, the premarital funds did not become "inextricably" commingled with the marital funds and the "separate property in the accounts did not become marital property by virtue of the doctrine of commingling." *Smith*, 93 S.W.3d at 879.

In *Langschmidt, supra*, the Supreme Court remanded the case to the trial court to consider whether the husband's commingling of marital earnings with his separate money market account was such that the "marital earnings became *inextricably mingled* with the remaining funds in the money market account." *Langschmidt*, 81 S.W.3d at 748 (emphasis in original). The Supreme Court then added:

> [I]f the trial court finds that Husband commingled his marital income with his separate account, then the entire value of the money market account and the entire value of assets purchased or transactions funded from the money market account after the first deposit of marital earnings would also be marital property. If, however, the trial court finds that Husband did not commingle his marital earnings with his money market funds, then the money market account and any purchases of assets from money market funds are Husband's separate property.

*Langschmidt*, 81 S.W.3d at 748 (footnote omitted).

Husband testified that his IRA account began when he deposited his pension from Uiterwoyk in the amount of $67,017. Husband's pension with Uiterwoyk was earned over a period of twenty years and Husband was married to Wife for almost one-half of that time. If this had been the only asset deposited into the IRA account, then trying to determine how much was attributable to premarital earnings versus post-marital earnings might be accomplished given the fact that the parties were married close to one-half of the time Husband worked at Uiterwoyk. Husband, however, deposited into the IRA account approximately $147,000 in funds earned through his employment with Ryan Walsh, and these funds clearly were earned in their entirety while the parties were married. Husband submitted no proof at trial which would have enabled the Trial Court to

---

[5] The *Smith* Court quickly concluded that the four IRAs which had been funded entirely with premarital dollars were the husband's separate property, as was their appreciation in value during the marriage which was due solely to "market factors and the compounding of the interest." *Smith*, 93 S.W.3d at 878.

determine the value of his premarital pension earnings. Husband even admitted that he did not know how much was earned prior to the marriage. Unlike the situation in *Smith*, no accountant was called as an expert witness to testify regarding the amount in the IRA account which was attributable to premarital earnings and the appreciation of those earnings. Given all of these factors, we believe the Trial Court had no choice but to declare the entire IRA as marital property because Husband inextricably commingled marital property with his separate property. Therefore, we affirm the Trial Court's conclusion that Husband's entire IRA account is marital property.

The same holds true for the account held in Husband's and his daughter's names. While Husband testified this account initially began with a $50,000 deposit from premarital funds obtained after his first divorce, Husband's ledgers do not support this testimony. More importantly, in December of 1999 and September of 2001, there was a total of $24,600 deposited into this account from Husband's IRA account, an account which we have determined was marital property. These deposits from the IRA account were characterized by SSB as "normal distributions." This would lead one to believe that these "normal distributions" from Husband's IRA account occurred at least once a year and on a regular basis, but we cannot determine how much more marital money from Husband's IRA was deposited into this account without complete documentation from SSB. As with the IRA account, there was absolutely no proof offered at trial establishing how much of the money in this account was premarital money versus post-marital money. Even assuming that this account did begin with a $50,000 deposit from Husband's first marriage, we have no choice but to conclude Husband commingled these separate funds with marital funds to the point that they have become inextricably commingled and the entire account must, therefore, be deemed marital property. The Trial Court's conclusion that all of the money contained in this account was marital property is likewise affirmed.

As to the account the Trial Court concluded was Wife's separate property, there was some factual disagreement over how much of a contribution, if any, Husband made to the appreciation of this account. For example, Husband's and Wife's testimony differs about the degree of his assistance with her investment decisions. There also was some dispute over the funds used to purchase Wife's mother's house, with Husband claiming Wife deposited some marital funds into her "personal" account after the house was sold. The Trial Court obviously resolved these factual issues in Wife's favor. The Trial Court's decision to credit Wife's testimony over Husband's was nothing more than a credibility determination. "Unlike this Court, the trial court observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). A trial court's determinations regarding credibility are accorded deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). We are unable to conclude that the preponderance of the evidence weighs against the Trial Court's findings that the funds in this account originated solely with Wife's premarital funds and that Husband did not substantially contribute to their appreciation during the course of the marriage. Accordingly, the findings and resulting conclusions of the Trial Court regarding the funds in this account are affirmed.

Having affirmed the Trial Court's classification of the various accounts at issue, we now turn to the Trial Court's distribution of the marital property. As noted, both parties claim they received an inequitable distribution. Tenn. Code Ann. § 36-4-121(c) requires a trial court to consider all relevant factors when making an equitable distribution of marital property, including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

A trial court has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991). As noted by this Court in *King v. King*, when dividing marital property:

> The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163] at 168. . . . In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

*King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 Tenn. App. LEXIS 100, at *11-12 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed*).

When considering the proceeds from the sale of the marital residence as well as the value of the financial accounts deemed to constitute marital property, Husband was awarded $600,118.49 in assets, which constitutes 54% of the marital property. Wife was awarded the remaining 46% which totaled $511,277.49. However, Wife also was awarded all of the $313,000 in funds contained in her separate account. While determining the percentage of the marital property each party was awarded is certainly helpful in understanding the overall property distribution, the fact that one party was not awarded exactly 50% of the marital property, standing alone, will rarely if ever constitute an abuse of discretion and a basis for reversal. There is no doubt that some of the factors contained in Tenn. Code Ann. § 36-4-121(c) weigh equally for Husband and Wife, while others tend to favor Wife and yet others tend to favor Husband. Our review of the entire record in this case convinces this Court that the Trial Court properly considered all relevant factors when distributing the marital property. We hold the Trial Court did not abuse its discretion when distributing the marital property. The Trial Court's overall distribution of the marital property is equitable, and, therefore, is affirmed.

**Conclusion**

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are assessed equally against Appellant, Ernst H. Hirt, and his surety, and Appellee, Grethy Hirt.

_____
D. MICHAEL SWINEY, JUDGE