IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 2, 2003 Session

## JOHN EDWARD WOODS v. JILL SUZANNE WOODS

**Appeal from the Circuit Court for Williamson County**
**No. I-2K475      Russ Heldman, Judge**

---

**No. M2002-01736-COA-R3-CV - Filed July 12, 2005**

---

This appeal involves the financial aspects of the dissolution of a twelve-year marriage. Even though the husband filed a petition for divorce in the Circuit Court for Williamson County, the parties eventually stipulated that the wife was entitled to divorce on the ground of the husband's adultery. Following a bench trial, the court awarded the wife eighty percent of the net marital estate, $1,000 per month in rehabilitative alimony for three years, $25,000 in alimony in solido, and one-half of her attorney's fees. The husband appealed. We have determined that the evidence does not support the manner in which the trial court divided the marital estate, the amount of the rehabilitative alimony award, the alimony in solido award, or the award for attorney's fees. We modify the judgment accordingly.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Modified and Affirmed

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, John Edward Woods.

Jeffrey L. Levy, Nashville, Tennessee, for the appellee, Jill Suzanne Woods.

### OPINION

### I.

John and Jill Woods were married in 1988. They lived in Chattanooga where Mr. Woods was employed by a food brokerage firm. Ms. Woods returned to college to earn a degree in education and then began teaching. In addition to their regular employment, the parties supplemented their income by selling clothing at flea markets. They obtained the clothing from Irwin Karp, Ms. Woods's father, who owned a chain of clothing stores throughout Tennessee. Mr. Karp sold the clothes to the Woodses at cost, and they would keep all the profits for themselves.

The first of the parties' three children was born in September 1992. They moved to the Nashville area in 1994 when Mr. Woods's employer offered to transfer him either to Knoxville or Nashville. With financial help from Ms. Woods's family, they purchased a house in Brentwood.

Ms. Woods found employment as a teacher in Franklin. Their second child was born in May 1995 and their third child in August 1997.

The Woodses continued to sell clothes at flea markets after they moved to Nashville. Ms. Woods eventually tired of teaching and of the flea market merchandising and convinced her father to open one of his clothing stores in Nashville and to hire her as manager. The new Clothing World store opened in the 100 Oaks Mall in 1998, and Ms. Woods became the manager. Her father paid her $1,000 per week and also provided her with a generous expense allowance. The opening of Clothing World was just one indication of Mr. Karp's generousness to Ms. Woods and her family. He lavished them with gifts and money throughout the marriage, and his largesse enabled the parties to maintain a lifestyle that was beyond their means.

All was not well with the parties' relationship after they moved to Nashville. Mr. Woods came to believe that Ms. Woods had a domineering personality and became increasingly disenchanted with her desire to control most aspects of the family's life. According to Mr. Woods, he eventually tired of arguing with Ms. Woods and began acceding to her demands on most matters. In May 1998, Mr. Woods began a clandestine extramarital affair with a co-worker. He eventually left home and filed for divorce in 1999 but later returned for the children's sake.

In 1999, Mr. Woods began to be concerned about his job security. He and Ms. Woods approached Mr. Karp about the possibility of opening a second Clothing World store in Nashville and hiring him as manager. Mr. Karp agreed. Opening the second store was a joint effort by the Woodses and Mr. Karp. Mr. Woods found suitable space in the Rivergate Mall area, and he and Ms. Woods signed a five-year lease. Mr. Karp provided money to prepare the store and purchase fixtures, and Ms. Woods used some of her own funds to purchase the inventory. The Rivergate Clothing World store opened in April 2000, but Mr. Woods withdrew from the enterprise in August 2000 when he decided to leave the marriage for the second and final time.[1]

Mr. Wood moved into an apartment in Hendersonville and filed a divorce complaint in the Circuit Court for Williamson County. Ms. Woods was distraught and suspicious about Mr. Woods's departure. She retained a private investigator who uncovered Mr. Woods's extramarital affair. Ms. Woods confronted Mr. Woods with this information in October 2000, and in December 2000, she filed an answer and counterclaim denying that she had engaged in inappropriate marital conduct and asserting that Mr. Woods had committed adultery and had abandoned his family. She also sought pendente lite support, as well as a restraining order to prevent Mr. Woods from having any contact with his girlfriend. The trial court, siding with Ms. Woods, ordered Mr. Woods to pay $2,000 in spousal support and to refrain from having intentional contact of any sort with his girlfriend until the litigation was concluded.

Mr. Karp continued to operate the Rivergate Clothing World store on his own after the parties separated. He eventually decided to close both this store and the store at 100 Oaks Mall. In May 2001, he negotiated a release of the Rivergate store lease which required the payment of

---

[1]Mr. Karp continued to operate the store following the Woodses' separation. He eventually closed the store in May 2001. Mr. Karp and Ms. Woods later asserted that part of the expenses Mr. Karp incurred to close his store was a marital debt.

$24,598.13 to the lessor. Mr. Karp paid $18,598.13 to the lessor and agreed to permit the lessor to liquidate a $6,000 certificate of deposit that the Woodses had provided to secure the lease.

The proceeding became more contentious when Ms. Woods filed a petition seeking to hold Mr. Woods in criminal or civil contempt for disobeying the order directing him to avoid contact with his girlfriend. Following a lengthy hearing, the trial court granted Ms. Woods a divorce based on Mr. Woods's stipulation to adultery but dismissed her petition to hold Mr. Woods in contempt.

In a series of orders spread out between April 3, 2001 and July 11, 2002, the trial court granted custody of the parties' three children to Ms. Woods, defined Mr. Woods's visitation rights, and ordered Mr. Woods to pay $1,325 in monthly child support. In addition, the court ordered Mr. Woods to pay Ms. Woods $1,000 per month in rehabilitative alimony for three years, awarded Ms. Woods $25,000 in alimony in solido, and ordered Mr. Woods to pay $9,308 of Ms. Woods's remaining attorney's fees.

The trial court also awarded Ms. Woods eighty percent of the parties' marital estate. In this context, the court determined that the post-divorce payment Mr. Karp had made to obtain the release of the lease on the Rivergate store was a joint marital debt. Accordingly, the court imposed on each of the parties the obligation to pay Mr. Karp one-half of the amount he had paid to the lessor of the Rivergate store.

Mr. Woods has appealed. He takes issue with (1) the trial court's classification of Mr. Karp's investment in the second clothing store as a marital debt, (2) the division of the marital estate, (3) the award of rehabilitative alimony, (4) the $25,000 alimony in solido award, and (5) the award for Ms. Woods's attorney's fees. We have determined that the trial court erred with regard to each of these matters.

## II.
### THE DIVISION OF THE WOODSES' MARITAL ESTATE

We turn first to Mr. Woods's issues regarding the classification of marital debt and the distribution of the parties' marital estate. He asserts that the trial court erred by determining that the parties incurred a marital debt to Mr. Karp when he paid part of the consideration for the release from the remainder of the Rivergate Clothing World's lease and by awarding a disproportionately large share of the marital estate to Ms. Woods. We have determined that the trial court erred by classifying Mr. Karp's payment to release the lease as a marital debt and that the manner in which the trial court divided the marital estate was inequitable.

### A.
**Principles for Dividing a Marital Estate**

Dividing a marital estate necessarily begins with the classification of the parties' property as either separate or marital property. *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001); *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Tennessee is a "dual property" state. *Smith v. Smith*, 93 S.W.3d 871, 875-76 (Tenn. Ct. App. 2002). Accordingly, property cannot be included in the marital estate unless it fits within the definition of "marital property" in Tenn.

Code Ann. § 36-4-121(b)(1)(A) (Supp. 2002). By the same token, "separate property," as defined in Tenn. Code Ann. § 36-4-121(b)(2), should not be included in the marital estate.[2] Because property classification issues are questions of fact, *Mitts v. Mitts*, 39 S.W.3d 142, 144-45 (Tenn. Ct. App. 2000); *Brown v. Brown*, 913 S.W.2d 163, 167 (Tenn. Ct. App. 1994), appellate courts will review a trial court's classification decisions using the familiar standard of review in Tenn. R. App. P. 13(d).

After a trial court has classified the property as either marital or separate, it should place a reasonable value on each piece of property subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003) (No Tenn. R. App. P. 11 application filed); *Robertson v. Robertson*, No. M1999-02103-COA-R3-CV, 2001 WL 459100, at *3 (Tenn. Ct. App. May 2, 2001) (No Tenn. R. App. P. 11 application filed). The parties themselves must come forward with competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d at 231; *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values presented by all the relevant valuation evidence. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997); *Brock v. Brock*, 941 S.W.2d 896, 902 (Tenn. Ct. App. 1996). Decisions regarding the value of marital property are questions of fact. *Kinard v. Kinard*, 986 S.W.2d at 231. Accordingly, they are entitled to great weight on appeal and will not be second-guessed unless they are not supported by a preponderance of the evidence. *Smith v. Smith*, 93 S.W.3d at 875; *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995).

Once the parties' marital property has been classified and valued, the trial court's goal is to divide the marital property in an essentially equitable manner. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d at 775. A division of marital property is not rendered inequitable simply because it is not precisely equal, *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002), *Cohen v. Cohen*, 937 S.W.2d at 832, or because each party did not receive a share of every piece of marital property. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001); *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998). The fairness of the trial court's approach is inevitably reflected in its results. *Bolin v. Bolin*, 99 S.W.3d 102, 107 (Tenn. Ct. App. 2002); *Watters v. Watters*, 959 S.W.2d at 591.

Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard v. Kinard*, 986 S.W.2d at 230. Trial courts have wide latitude in fashioning an equitable division of marital property, *Fisher v. Fisher,* 648 S.W.2d 244, 246 (Tenn. 1983); *Manis v. Manis*, 49 S.W.3d at 306, and appellate courts accord great weight to a trial court's division of marital property. *Wilson v. Moore,* 929 S.W.2d 367, 372 (Tenn. Ct. App.

---

[2]The dividing line between marital and separate property frequently becomes blurred. Marital property can become separate property when one spouse gives it to the other spouse. *Kinard v. Kinard*, 986 S.W.2d 220, 232 (Tenn. Ct. App. 1998); *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989). On the other hand, separate property can become marital property when its owner commingles it with marital property and no longer treats it as separate property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002); *Smith v. Smith*, 93 S.W.3d at 878; *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988). Even if property is clearly separate, the increase in the property's value during the marriage and the income from the property may be considered marital property if the nonowner spouse contributed substantially to the separate property's preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(B); *Cohen v. Cohen*, 937 S.W.2d 823, 832-33 (Tenn. 1996).

1996); *Edwards v. Edwards,* 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). Thus, we will ordinarily defer to the trial court's division of the parties' marital estate unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Brown v. Brown,* 913 S.W.2d at 168; *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

## B.
## Mr. Karp's Payment to Obtain the Release the Clothing World Lease

Before we can consider whether the trial court's division of the parties' net marital estate was equitable, we must first determine whether the evidence supports the trial court's conclusion that Mr. and Ms. Woods incurred a marital debt to Mr. Karp when he voluntarily paid the lessor of the Rivergate Clothing World store $18,598.13 to obtain a release of the remainder of the five-year lease on the store property. The trial court determined that the Woodses owed Mr. Karp $18,598.13 even though neither Ms. Woods nor Mr. Woods included the clothing store, or any of its assets or liabilities, on their "statement of issues, income, property, and expenses"[3] and the issue had not been litigated at trial. We have determined that the evidence does not support the trial court's conclusion that the Woodses were obligated to reimburse Mr. Karp for the payment he made to obtain the release of the lease for the Rivergate Clothing World store.

## 1.

The Rivergate Clothing World store was essentially part of Mr. Karp's chain of stores.[4] While Mr. and Ms. Woods signed the lease and defrayed some of the expenses associated with opening the store,[5] Mr. Karp provided the funds for the build-out of the space and then provided the necessary operating funds as long as the store was opened. All of the store's inventory was obtained from the sources Mr. Karp used to obtain the inventory for his other stores. The best evidence that Mr. Karp viewed the Rivergate store as one of his stores is his testimony regarding his plans to "give" both the Rivergate store and the 100 Oaks store to the Woodses.[6]

---

[3]It is customary for lawyers practicing in the Twenty-First Judicial District to file a "statement of issues, income, property, and expenses" in divorce proceedings.

[4]Ms. Woods conceded in papers filed in the trial court that it was Mr. Karp who "opened" the Rivergate store. The trial court also found as fact that "[n]either party had an ownership interest in the business."

[5]Mr. Woods negotiated the lease for the store, and Mr. and Ms. Woods provided the $6,000 certificate of deposit required to secure the lease. In addition, Ms. Woods used $20,000 of her separate funds to purchase the store's initial inventory.

[6]Mr. Karp testified on April 4, 2001 that he instructed his accountant to set up a corporation for his daughter and son-in-law that would own the stores. He also testified that Mr. Woods expressed a concern to him about the reactions that Mr. Karp's other children would have when he gave the Woodses the stores in Nashville, but Mr. Karp told Mr. Woods that he "would be willing to turn it over to him." Mr. Karp characterized the transaction differently in a lawsuit he filed against Mr. Woods in December 2001. He asserted that Mr. Woods "began pressuring . . . [him] to transfer ownership of the Rivergate Clothing World to him and his then wife." *Karp v. Woods*, No. 01C-3763 (Verified Complaint for Damages for Fraud David. Cir. filed Dec. 11, 2001).

Mr. Karp continued to oversee the operation of the Rivergate store after the Woodses separated in August 2000 and even after Ms. Woods quit as store manager in October 2000. In fact, he continued to operate the store throughout the divorce proceeding and was still running the Rivergate store at the time of trial. It was only after the building and contents of the Rivergate store sustained significant rain damage in April 2001 that Mr. Karp decided to close both stores and to leave the Nashville area. Eventually, Mr. Karp, apparently without consulting either Mr. Woods or Ms. Woods, negotiated a release from the Rivergate store lease that required the forfeiture of the Woodses' $6,000.00 certificate of deposit, as well as a payment of $18,598.13 by Mr. Karp.

Neither Ms. Woods nor Ms. Woods listed the Rivergate store as a marital asset or liability in their pleadings or in any of their pre-trial or post-trial statements regarding their assets and liabilities. Not surprisingly, the store was also not mentioned in either of the parties' proof relating to the division of the martial estate. However, on May 22, 2001, more than one month after the trial, Ms. Woods filed a post-trial motion seeking the trial court's approval of the terms that Mr. Karp had negotiated for the release of the Rivergate store's lease. Ms. Woods asserted for the first time that the lease obligation was a marital debt and that the court should require Mr. Woods "to bear sole responsibility for that sum or to bear responsibility for a substantial part of it." Mr. Woods responded that the issues involving the lease for the Rivergate store were "collateral to this divorce proceeding and must be addressed in another forum."

During a hearing held on May 31, 2001, the parties agreed that the Rivergate store lease was a marital debt and stated that the terms of the settlement negotiated by Mr. Karp were acceptable. However, Mr. Woods questioned whether either he or Ms. Woods were obligated to repay Mr. Karp the $18,598.13 that he contributed to the settlement. On June 11, 2001, the trial court entered an order approving the terms of the release of the Rivergate store. While the court found that the "sums advanced by Wife's father, Irwin Karp, constitute a marital debt of the parties," it reserved for future determination whether either Mr. Woods or Ms. Woods should be required to repay Mr. Karp all or any part of these funds.

In December 2001, Mr. Karp sued Mr. Woods in the Circuit Court for Davidson County asserting that Mr. Woods had fraudulently induced him to open the Rivergate Clothing World store and seeking $150,000 in compensatory and $500,000 in punitive damages. In March 2002, Ms. Woods requested the trial court to dispose of the last remaining issue in the divorce proceeding – the dispute surrounding their liability to Mr. Karp for his $18,598.13 contribution to settlement of the Rivergate store lease. Not surprisingly, Ms. Woods insisted that Mr. Woods should be solely responsible for repaying Mr. Karp, while Mr. Woods asserted that the responsibility for repaying Mr. Karp should fall to Ms. Woods. On June 11, 2002, the trial court filed an order determining that each party was liable to Mr. Karp for one-half of his $18,598.13 payment toward the settlement of the Rivergate store lease.

**2.**

Dividing a marital estate includes both the division of the marital assets and the allocation of the marital debts. *Robertson v. Robertson*, 76 S.W.3d at 341. Accordingly, marital debts are subject to equitable allocation, *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995), and the same rules of fairness and equity which apply to the equitable division of marital assets apply

to the division of marital debts. *Hardy v. Hardy*, 429 S.E.2d 811, 813-14 (S.C. Ct. App. 1993). Martial debts are debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In the context of divorce proceedings, the courts should allocate the debts considering the following factors: (1) the debt's purpose, (2) the party who incurred the debt, (3) the party or parties who benefitted from incurring the debt, and (4) the party best able to repay the debt. *Alford v. Alford*, 120 S.W.3d at 814; *Mondelli v. Howard*, 780 S.W.2d 769, 723 (Tenn. Ct. App. 1989).

The division of the marital debt is heavily fact-dependent; therefore, there are no bright-line rules providing guidance for the distribution of marital debt. However, the prior cases provide several helpful rules-of-thumb. First, for example, it is commonplace for debts to follow the assets they purchased.[7] Second, the courts are now generally inclined to award economically disadvantaged spouses a small portion of the marital debt in cases where there are few marital assets.[8] Third, when a marital debt is owed to a party who is related to one of the spouses, the debt is frequently assigned to the spouse who is related to the creditor.[9] In the final analysis, the justness of the allocation of the marital debt, like the division of marital property, depends on the final results. *King v. King*, 986 S.W.2d at 219; *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990).

**3.**

We need not decide here whether the commercial lease for the Rivergate store was a marital debt. Neither party identified the lease as either a marital debt or a marital asset prior to or during the divorce hearing, and if it was a debt, it was completely extinguished on or after May 31, 2001 when the lessor unconditionally released the Woodses from their obligations under the lease. The only question before us is whether the Woodses incurred a marital debt to Mr. Karp when he paid the lessor $18,596.13 to obtain the release of the Rivergate store lease. We have determined that they did not.

According to *Alford v. Alford*, marital debts are debts that arise during the course of the marriage. Therefore, post-divorce debts cannot, by definition, be marital debts. The Woodses' marriage ended on April 3, 2001, when the trial court entered its "order of divorce" stating that the "[b]onds of matrimony heretofore existing between the parties are hereby terminated and dissolved." Accordingly, Mr. Karp's $18,598.13 payment to the lessor, presumably made following the May 31, 2001 hearing, could not have given rise to a marital debt because it was made after the parties had been divorced for almost two months.

Even if Mr. Karp had paid for the release of the lease during the Woodses' marriage, it is doubtful that he did so with any expectation of being repaid. Determining whether an intra-family transaction is a loan or a gift is a question of fact. *In re Marriage of Michel*, 142 S.W.3d 912, 922

---

[7]*Kinard v. Kinard*, 986 S.W.2d at 233; *King v. King*, 986 S.W.2d at 219.

[8]*Robertson v. Robertson*, 76 S.W.3d at 341.

[9]W. WALTON GARRETT, TENNESSEE DIVORCE, ALIMONY & CHILD CUSTODY, 19 Tenn. Prac. § 15:14, at 379 (2004).

(Mo. Ct. App. 2004). The facts of this case demonstrate that Mr. Karp obtained the release of the Rivergate store lease as much for his own benefit as for the Woodses' benefit.

The Woodses were not the only persons who stood to benefit from the lease of the premises for the Rivergate store. The lease was clearly intended to benefit their joint business enterprise with Mr. Karp. Accordingly, Mr. Karp, as the "owner" of the Rivergate Clothing World store, was the primary beneficiary of the lease agreement between the Woodses and the lessor of Rivergate store premises.

By October 2000, both Mr. Woods and Ms. Woods were no longer involved with the store, and Mr. Karp was operating it on his own. He continued to make the lease payments when they became due. As far as this record shows, Mr. Karp never called upon either Mr. Woods or Ms. Woods to make the lease payments or to reimburse him for any of the payments he was making. When Mr. Karp decided to close the Rivergate store in 2001, he had a strong business and personal incentive to obtain the landlord's consent to release the remaining term of the lease. He wound down the Rivergate store and negotiated the release of the lease without consulting either Mr. Woods or Ms. Woods. The claim concerning Mr. Karp's payment for the release of the lease surfaced only after Mr. Karp and his daughter decided to try to convince the trial court to require Mr. Woods to repay Mr. Karp the $18,598.13 he paid to the landlord.

Two conclusions may be drawn from Mr. Karp's forbearance from demanding that the Woodses either make the lease payments or reimburse him for the payments he was making and his unilateral negotiation of the release of the lease. First, Mr. Karp's conduct could reflect his understanding that the lease payments were part of the expenses of running his business rather than personal obligations of his daughter and estranged son-in-law. Alternatively, in light of Mr. Karp's past generosity toward the Woodses, it would be reasonable to conclude that his payment of the lease and for the release of the lease were gratuitous.

The conduct of the parties from August 2000 to May 2001 is inconsistent with the notion that Mr. Karp anticipated that the Woodses would reimburse him for all or part of the payment he made to obtain the release of the lease on the Rivergate store. Accordingly, we find that the trial court erred by determining that the Woodses owed Mr. Karp $18,598.13 and that this obligation was a marital debt. Therefore, this transaction should not be considered in the context of determining whether the manner in which the trial court divided the marital estate was fair and equitable.

## C.
### The Fairness of the Division of the Marital Estate

We now turn to the fairness of the manner in which the trial court divided the parties' marital estate. Two aspects of this property division stand out. First, the trial court, without explanation, decided to award each party one-half of the other party's IRA and 401(k) plans. Second, the trial court awarded Ms. Woods eighty percent of the parties' marital estate. We have determined, based on our evaluation of the evidence in light of the factors in Tenn. Code Ann. § 36-4-121(c) and the admonition in Tenn. Code Ann. § 36-4-121(a)(1) against considering fault when dividing a marital estate, that a more equitable division of the marital estate is in order.

The particulars of the manner in which the trial court divided the parties' marital estate are illustrated by the following charts:

**Marital Property**

| **Wife** | | **Husband** | |
|---|---|---|---|
| House | $295,000 | ½ Combined Retirement accounts[10] | $36,083 |
| ½ Combined Retirement Accounts[10] | 36,083 | Adjustment for Minivan Equity[10] | 8,000 |
| 1999 Honda Odyssey Minivan | 15,300 | Checking Account | no value given |
| Checking Account | no value given | Apartment Furnishings | stipulated |
| House Furnishings | stipulated | | |
| Total marital property | $346,383 | | $44,083 |

**Marital Debt**

| **Wife** | | **Husband** | |
|---|---|---|---|
| Mortgage | $177,545 | Karp Reimbursement | $9,299 |
| Minivan | 14,430 | | |
| Karp Reimbursement | 9,299 | | |
| Total debt | $201,274 | | $9,299 |
| **Net share of estate** | **$145,109** | | **$34,784** |

The marriage lasted for twelve years, and the parties' financial positions were roughly comparable when they entered the marriage. Both worked outside of the home throughout the marriage and pooled their income in a joint account to pay for marital expenses. They are approximately the same age and in good health. Ms. Woods has two bachelor's degrees, and Mr. Woods has an associate's degree. Although Mr. Woods's job with the food brokerage enables him to earn more income than Ms. Woods was actually earning at the time of the divorce, Ms. Woods has a demonstrated earning potential that far exceeds her income at the time of the divorce. Even if she does not work for her father, she is capable of earning a higher income as a teacher.

While these factors would support an essentially equal division of the marital estate, two other factors favor awarding Ms. Woods a larger share. First, the parties themselves agreed during the trial that the fact that Ms. Woods used her separate funds to enable them to purchase their house

[10]The trial court combined the amount of the balances in all four of the parties' retirement accounts, deducted $8,000 from the total for the minivan equity, and then awarded each party one-half of the remaining amount. Then the court awarded the $8,000 to Mr. Woods in place of his one-half interest in the Honda minivan.

should be recognized in the division of the property.[11] Second, Tenn. Code Ann. § 36-4-121(d) provides that a spouse with physical custody of the parties' children should be favored with regard to the family home and the household effects.

Accordingly, we have determined that the manner in which the trial court divided the parties' marital estate should be modified in three ways. First, we have determined that each party should keep their respective retirement accounts, thereby avoiding the possibility of penalties for early liquidation. Second, we have determined that Ms. Woods should received the Honda minivan and the debt associated with it. Third, we have determined that Ms. Woods is entitled to all the equity in the parties' marital home because she is the primary residential parent and because her contributions enabled the parties to purchase the home in the first place.

The following table reflects our revised distribution of the marital estate:

### Marital Property

| Wife | | Husband | |
|---|---|---|---|
| House | $295,000 | Cigna 401k | $ 40,974 |
| Merrill Lynch Retirement Account | 9,000 | Fidelity IRA | 26,191 |
| Roth IRA | 4,000 | Checking Account | no value given |
| Minivan | 15,300 | Apartment Furnishings | stipulated |
| Checking Account | no value given | | |
| House Furnishings | stipulated | | |
| Total property | $323,300 | | $ 67,165 |

### Marital Debt

| Wife | | Husband | |
|---|---|---|---|
| Mortgage | $177,545 | | -0- |
| Minivan | 14,430 | | |
| Total debt | $191,975 | | -0- |
| **Net share of estate** | **$131,325** | | **$67,165** |

---

[11]There is no question that the funds Ms. Woods used to help the parties purchase their house are no longer her separate property because her use of the them for marital purposes transmuted them into marital property. However, it is appropriate to consider the source of the funds in determining how the asset purchased by the funds should be divided. While the parties agreed that Ms. Woods contributions should be considered, they disagreed regarding the amount of these contributions. Ms. Woods stated that she contributed $55,768, while Mr. Woods valued them at $38,000.

As a result of our revised division of the parties marital property and allocation of the marital debt, Ms. Woods will receive sixty-six percent of the net marital estate, and Mr. Woods will receive thirty-four percent.

### III.
### THE AWARD OF REHABILITATIVE ALIMONY

Mr. Woods also asserts that the trial court erred by requiring him to pay Ms. Woods $1,000 per month in rehabilitative alimony for three years. He asserts that Ms. Woods's claim for alimony is greatly inflated by the fact that they lived beyond their means during the marriage and that he is unable to pay Ms. Woods $1,000 per month because the combined amount of his child support and alimony payments will not enable him to support himself. We have determined that Ms. Woods is entitled to rehabilitative alimony. However, we have determined that Mr. Woods cannot realistically afford to make $1,000 per month alimony payments in light of his other obligations. Accordingly, we reduce the amount of Mr. Woods's alimony obligation to $500 per month.

### A.

There are no hard and fast rules for spousal support decisions. *Manis v. Manis*, 49 S.W.3d at 304; *Anderton v. Anderton*, 988 S.W.2d at 682; *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996). Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999). Accordingly, appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. *Nelson v. Nelson*, 106 S.W.3d 20, 23 (Tenn. Ct. App. 2002); *Brown v. Brown*, 913 S.W.2d at 169. Our role is not to fine-tune a trial court's spousal support award, *Davidson v. Davidson*, No. M2001-01830-COA-R3-CV, 2002 WL 31769205, at *3 (Tenn. Ct. App. Dec. 11, 2002) (No Tenn. R. App. P. 11 application filed), but rather to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001).

Tennessee law recognizes several separate classes of spousal support, including long-term periodic spousal support (alimony in futuro),[12] alimony in solido,[13] rehabilitative spousal support,[14]

---

[12]Long-term spousal support is intended to provide long-term support to an economically disadvantaged spouse who is unable to be rehabilitated. *Burlew v. Burlew*, 40 S.W.3d at 471; *Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997). It is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse. *Wright v. Quillen*, 83 S.W.3d 768, 773 (Tenn. Ct. App. 2002).

[13]Alimony in solido is a single lump sum payment of cash or property. *Loria v. Loria*, 952 S.W.2d at 838. Unlike alimony in futuro, it is considered a final judgment, ordinarily unchangeable by the court after the expiration of the time for appeal. *Loria v. Loria*, 952 S.W.2d at 838.

[14]Rehabilitative spousal support is intended to enable an economically disadvantaged spouse to acquire additional education or training that will enable the spouse to achieve and maintain a standard of living comparable to (continued...)

-11-

and transitional spousal support.[15] Tenn. Code Ann. § 36-5-101(d)(1) reflects a statutory preference favoring rehabilitative spousal support and transitional spousal support over long-term periodic spousal support. *Bratton v. Bratton*, 136 S.W.3d at 605; *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Crabtree v. Crabtree*, 16 S.W.3d 356, 358 (Tenn. 2000). However, this statutory preference does not entirely displace the other forms of spousal support when the facts of the case warrant long-term or more open-ended support. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Isbell v. Isbell*, 816 S.W.2d 735, 739 (Tenn. 1991).

Initial decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of all relevant factors, including those identified in Tenn. Code Ann. § 36-5-101(d)(1)(E). *Robertson v. Robertson*, 76 S.W.3d at 338; *Dube v. Dube*, 104 S.W.3d 863, 868 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). Among these factors, the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson v. Robertson*, 76 S.W.3d at 342; *Bogan v. Bogan*, 60 S.W.3d at 730; *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). Of these two factors, the disadvantaged spouse's need is the threshold consideration. *Aaron v. Aaron*, 909 S.W.2d at 410; *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999).

### B.

The record supports the trial court's conclusion that Ms. Woods is entitled to rehabilitative spousal support. She was trained to be a teacher and actually taught school early in the marriage. However, she left the teaching profession to work for her father, and now she faces the prospect of returning to school to renew her teaching credentials and to sharpen her skills. At the same time, she is the primary residential parent of three children between the ages of eight and twelve. Given her obligations to support herself and her children and her other parental responsibilities, it was not unreasonable for the trial court to conclude that Ms. Woods was entitled to rehabilitative support for three years.

The difficulty with the trial court's rehabilitative alimony award is its amount. The trial court ordered Mr. Woods to pay Ms. Woods $1,000 per month. This payment, coupled with Mr. Woods's $1,325.00 per month child support obligation, consumes almost eighty percent of Mr. Woods's net monthly income and would require Mr. Woods to support himself on approximately $663.00 per

---

[14](...continued)
the standard of living that existed during the marriage or to the post-divorce standard of living expected to be available to the other spouse. Tenn. Code Ann. § 36-5-101(d)(1)(C) (Supp. 2004); *see also Robertson v. Robertson*, 76 S.W.3d at 340-41; *Smith v. Smith*, 912 S.W.2d 155, 160 (Tenn. Ct. App. 1995).

[15]Transitional spousal support is paid for a definite duration when a court finds that rehabilitation is not necessary but that the economically disadvantaged spouse needs assistance adjusting to the economic consequences of divorce. Tenn. Code Ann. § 36-5-101(d)(1)(D).

month. This award is simply unrealistic as a practical matter, notwithstanding the fact that fault may be taken into consideration in setting spousal support.[16]

When courts are setting spousal support, they should take into consideration the outstanding obligations of both the recipient spouse and the paying spouse. Tenn. Code Ann. § 36-5-101(d)(1)(E)(i). In the past, this court has reduced the amount of spousal support when, taking into consideration the paying spouse's other financial obligations, it has determined that the paying spouse would have insufficient income to support himself or herself. *See, e.g., Sullivan v. Sullivan*, 107 S.W.3d at 511; *Anderton v. Anderton*, 988 S.W.2d at 683.

We have reviewed this record in light of all of Mr. Woods's financial obligations, the parties' respective earning capacities and the financial resources available to them, along with the age and mental and physical condition of the parties, and we have determined that Mr. Woods should have been required to pay Ms. Woods $500 per month for three years. Even with this adjustment, Mr. Woods will still be required to support himself on approximately forty percent of his net monthly income.

The reduction in the amount of Mr. Woods's spousal support obligation should relate back to the August 13, 2001 order requiring Mr. Woods to pay Ms. Woods $1,000 per month. In the event that Mr. Woods has overpaid his spousal support obligation, he is entitled to recover the overpayment from Ms. Woods. Therefore, on remand, the trial court should calculate the amount of Mr. Woods's overpayment of spousal support, if any, and then award Mr. Woods a judgment for this amount. If Ms. Woods lacks the funds to be able to pay this judgment within sixty days after its entry, she should be ordered to execute a non-interest bearing promissory note payable to Mr. Woods in the amount of the overpayment. This note shall be shall be due and payable upon Ms. Woods's death or remarriage, the sale or transfer of the parties' house, or on August 1, 2015, whichever event occurs first. This note shall be secured by a lien on the parties' house.

## IV.
### THE ALIMONY IN SOLIDO AWARD

Mr. Woods takes issue with the trial court's decision to award Ms. Woods $25,000 in alimony in solido. He asserts that the trial court awarded Ms. Woods alimony in solido solely to punish him for his infidelity. Ms. Woods insists that she is entitled to the award because of the financial loss Mr. Woods's infidelity caused her and the parties' children.

We have already pointed out that Tenn. Code Ann. § 36-5-101(d)(1)(E)(ix) permits the courts to consider fault as one of the factors when setting spousal support. However, this court has repeatedly disapproved of punitive alimony, noting the precedents holding that the purpose of alimony is not punish the guilty spouse. *Wilder v. Wilder*, 66 S.W.3d at 895; *Anderton v. Anderton*, 988 S.W.2d at 682; *Duncan v. Duncan*, 686 S.W.2d 568, 571-72 (Tenn. 1984).

---

[16]Tenn. Code Ann. § 36-5-101(d)(1)(E)(ix) (Supp. 2004).

One of the most common purposes for awarding alimony in solido is to adjust the distribution of marital property. *Burlew v. Burlew*, 40 S.W.3d at 471. The trial court was plainly not using alimony in solido for that purpose in this case because it had already awarded Ms. Woods approximately eighty percent of the marital estate by the time it decided to award her an additional $25,000 in alimony insolido. The combined effect of the manner in which the trial court divided the marital estate and its alimony in solido award would have been to effectively award Ms. Woods ninety-five percent of the marital estate.

We have already concluded in Section II that the trial court erred by awarding Ms. Woods eighty percent of the marital estate. The alimony in solido award in this case only compounded the error. The trial court offered no explanation for this award, and the facts and circumstances of this case point to the likelihood that the alimony in solido was intended to further punish Mr. Woods. The division of marital property and award of rehabilitative alimony, as modified by this opinion, adequately meet Ms. Woods's needs and appropriately balance the factors in Tenn. Code Ann. §§ 36-4-121(c) and 36-5-101(d)(1)(E). Accordingly, we vacate the alimony in solido award.

## V.
### THE AWARD OF ATTORNEY'S FEES

As a final matter, Mr. Woods takes issue with the trial court's decision to require him to pay one-half of Ms. Woods's attorney's fees still owing at the time of trial. While he concedes that awards for attorney's fees are discretionary, he insists that the award in this case was inappropriate first because he had already paid $7,750 of Ms. Woods's attorney's fees pendente lite and because a bulk of her remaining fees stemmed from Ms. Woods's vigorous and prolonged efforts to establish that Mr. Woods had committed adultery even after he admitted it and from her unsuccessful efforts to have Mr. Woods held in contempt for violating the order directing him to refrain from intentionally contacting his paramour while the divorce proceedings were pending.[17]

Attorney's fees may be awarded in divorce cases, and are considered to be a form of alimony in solido. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d at 864. These awards are largely discretionary with the trial court, and appellate courts will not interfere unless the trial court has not exercised its discretion appropriately based on the facts. *Aaron v. Aaron*, 909 S.W.2d at 411.

We have determined that the record supports the trial court's decision to require Mr. Woods to defray part of Ms. Woods's legal expenses but that the record does not support requiring Mr. Woods to pay $9,308.53. There are two reasons for our decision. First, Mr. Woods had already paid $7,750 of Ms. Woods's legal expenses. Second, approximately two-thirds of the time billed by Ms. Woods's lawyer between January 26, 2001 and May 15, 2001 was related to the prosecution of the civil and criminal contempt petitions that were ultimately dismissed. Accordingly, we have determined that the portion of the order requiring Mr. Woods to pay a portion of Ms. Woods's legal expenses should be modified from $9,308.53 to $3,206.00.

---

[17]Mr. Woods did not challenge the breadth of this order. Even though it was inappropriately broad, Mr. Woods was obligated to abide by it.

## VI.

In summary, we modify the division of the marital estate to provide for a more equal and equitable division of the marital property and debt; we reduce the amount of the rehabilitative alimony award from $1,000.00 to $500.00 per month; we vacate the alimony in solido award; and we reduce the award of attorney's fees from $9,308.53 to $3,206.00. We affirm all other provisions in the orders and remand the case to the trial court for whatever further proceedings may be required. We tax the costs of this appeal in equal proportions to John Edward Woods and his surety and to Jill Suzanne Woods for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.